Donna FELDMAN, Plaintiff–Appellant,

v.

AMERICAN MEMORIAL LIFE INSURANCE COMPANY, formerly known as Prairie States Life Insurance Company, Defendant–Appellee.

No. 98–1831.

United States Court of Appeals, Seventh Circuit.

Argued May 10, 1999.

Decided Nov. 9, 1999.

David A. Novoselsky (argued), Novoselsky & Associates, Chicago, IL, Alan G. Schuster, Highland Park, IL, for Plaintiff–Appellant.

Douglas M. Werman (argued), Fox & Grove, Chicago, IL, Martin K. Denis, Barlow, Kobata & Denis, Chicago, IL, for Defendant–Appellee.

Before BAUER, KANNE and EVANS, Circuit Judges.

KANNE, Circuit Judge.

After suffering two accidents while working for American Memorial Life Insurance Co., formerly known as Prairie States Life Insurance Co. ("Prairie States"), Plaintiff Donna Feldman filed for worker's compensation and Social Security Disability Insurance, and was terminated soon afterward. Feldman then sued Prairie States on five counts of unlawful discharge in federal district court. Over the course of a year and a half, this litigation involved a settlement which was subsequently vacated on Feldman's motion, a request for sanctions against Feldman, a motion by Feldman to add a new defendant and finally, summary judgment for Prairie States on all five of Feldman's claims. Feldman now appeals the grant of summary judgment on three claims and the denial of leave to amend her complaint.

Feldman compares this case to Akira Kurosawa's film, *Rashomon*, in which each character recounts a different version of the story's events. She urges us to reverse the district court's decisions and remand for trial to resolve the discrepancy between the facts alleged by her and Prairie States. We agree with the district court that trial is unnecessary. Although there are differences between the factual accounts offered by the two parties, those disagreements are immaterial to the disposition of this case. We affirm the district court's grant of summary judgment and denial of leave to amend the complaint.

## I. HISTORY

Donna Feldman began working for Prairie States on February 1, 1994, as an area representative. Chief among her duties was making sales visits to funeral homes throughout northern Illinois to market Prairie States' services. Although she conducted some business over the telephone and through personal mailings, Feldman's work required her to drive to funeral homes on a daily basis, logging 2,000 to 3,000 miles on the road each month, and 20,000 to 25,000 miles during the year, for work.

On February 24, 1994, Feldman's car was struck from behind while she waited at a traffic light, causing injuries to Feldman's neck. Several months later, on September 22, 1994, Feldman suffered a second accident when she fell down some stairs during a funeral home visit. Feldman testified that "her right knee was gouged out" and "had a hole in it," her "left knee was all swollen and black-and-blue," and she "banged her right elbow, scraped her right palm, cut her middle finger on her left hand, and hurt her wrist, back, and neck." For three weeks following this second accident, Feldman stayed in bed and was not physically able to go to work. She could not drive except for short periods because she was "very stiff and sore" and had "great difficulty moving."

During the middle of October 1994, she returned to work but still experienced difficulty driving. As a result of the injury to her left hand, Feldman drove using her right hand and only two fingers on her left hand even though she found it dangerous. After Feldman reported that "she was sure that she was going to get in an accident," Mary Snortland, director of human resources at Prairie States, told Tom Bischoff, Feldman's supervisor, that Prairie States needed a medical release attesting to Feldman's ability to drive safely. On October 31, 1994, Snortland ordered Feld-

man off the road until she could produce a statement from a doctor "saying that she can drive a car in a safe manner."

On November 4, 1994, Feldman checked into the emergency room at Lutheran General Hospital for treatment on her left hand and back. After learning of Feldman's hospital visit and her continued fears about driving, Bischoff immediately granted Feldman a personal leave of absence pending her recovery. On November 7, 1994, Feldman again told Bischoff that she could drive only with one hand, and Bischoff responded that she must provide a doctor's release indicating that she could return to work without any medical or physical restrictions.

From November 11, 1994, to January 25, 1995, Feldman received outpatient treatment thrice weekly for her injuries. Dr. Jerry Bauer issued her a release, dated December 9, 1994, stating that she could return to work within her own limitations. Dr. Jeff Vitosky issued a release, dated January 23, 1995, stating that Feldman was "able to return to work full duty within patient limitations." Neither release characterized Feldman's condition as a "disability" or indicated the scope of her limitations.

Feldman already had filed two claims for worker's compensation in September 1994, based on her injuries allegedly stemming from the two accidents. Fireman's Fund Insurance handled her claims but repeatedly denied authorization and payment for medical care. Almost two years later, on appeal, the Illinois Industrial Commission would deny her claim for compensation, finding that Feldman could not prove a causal relationship between her accidents and her medical conditions. However, at the end of December 1994, Maria Boatwright from Fireman's Fund informed Snortland that Feldman had received a written release to work from Dr. Bauer and faxed a copy to her. Snortland concluded that the release was sufficient to allow Feldman back to work. She then mailed a letter dated January 18, 1995, to Feldman that read as follows:

Our records indicate that you have been absent from work since November 4, 1994 which is the last full work day reflected in our payroll reports. As part of our effort to accommodate you, you were granted a personal leave of absence as of that date. We cannot, however, continue your leave indefinitely. Consequently, your leave will end on January 30, 1995 unless you return to work on a full-time basis on or before that date. If you do not return to work on a full-time basis on or before January 30, 1995, you will be terminated.... If you intend to return to work, please complete the enclosed form and return it to me no later than January 27, 1995. In addition, we will need a written release from your doctor which attests to your physical ability to perform the essential functions of your position including, but not limited to, being able to drive an automobile and personally visit with funeral directors on a daily basis. Your doctor must also: (1) specifically release you to return to work and (2) state if you have any workrelated job limitations and if you do, describe those limitations in detail and suggest possible accommodations.

Feldman replied, in a letter dated January 25, 1995, that she intended to return to work by January 30, 1995. She attached copies of releases from both doctors but noted that her physical limitations "remain substantial" and "the risk of further injury is substantial." She also stated that she understood the November 17 letter from Bischoff to bar her from work until a doctor vouched that she was "physically fit, without impairment or further risk to [her] health." She asked whether this letter superseded the prior letter and permitted her immediate return to work. Prairie States did not respond to her query.

Feldman did not return to work on January 30, 1995, and Prairie States terminated Feldman the following day. Though

she claimed at the time of her discharge that she "wasn't qualified to do much of anything," Feldman had a master's degree in communications and professional experience in pre-need planning, sales, management and teaching. Since her termination by Prairie States, she found employment as a telemarketer and as an instructor with the Chicago City Colleges. She also worked part-time from home designing women's casual clothing with some success.

Feldman previously had applied, on December 8, 1994, to the Social Security Administration ("SSA") for Social Security Disability Insurance benefits ("SSDI"). In her submissions to the SSA, Feldman wrote that she was "completely and totally disabled and cannot perform any substantial gainful employment." She explained further that "limited movement in [her] head (neck cervical) pain forced [her] to be in bed a lot." She swore that she "cannot work a six to eight hour day" and "daily activities are really restrictive" because she had "virtually no use of her left hand" and experienced fatigue and severe pain that "restricted use of her upper extremities." Even normal functions like "squeezing toothpaste, putting on panty hose, cooking" were "difficult or impossible to do." Regarding her job, Feldman said that she "can't carry briefcase, luggage, can't drive long-distances which my job requires." She complained that she could "barely move" and "maybe it would be better if [she] wasn't here."

On May 21, 1996, based on these attestations, the SSA found that Feldman was entitled to SSDI benefits. An SSA administrative law judge ruled that Feldman was "under a 'disability,' as that term is defined in the Social Security Act" since November 4, 1994, and her condition prevented her from "performing past relevant work or any other work which exists in significant numbers in the national economy."

Feldman brought suit against Prairie States on June 5, 1996, in district court alleging that Prairie States violated: (1) the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; (2) the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140 et seq.; (3) the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/1-101 et seq.; (4) the public policy of Illinois against retaliatory termination; and (5) the Illinois Health Insurance Claim Filing Act, 820 Ill. Comp. Stat. 45/1 et seq. After discovery, Prairie States moved for summary judgment on all five claims under Rule 56 of the Federal Rules of Civil Procedure.

On September 29, 1997, six months after the March 7, 1997, close of discovery, Feldman moved for leave to amend her complaint. She sought to add Network Administrators, the health insurance administrator for Prairie States, as an additional defendant and to add another ERISA claim to her complaint. On October 8, 1997, the district court denied her motion to amend.

The district court granted summary judgment for Prairie States on March 3, 1998. The court found that: (1) Plaintiff's ADA claim failed because she was not "disabled" under the ADA; (2) Plaintiff failed to state a claim under Section 510 of ERISA because she was not part of the protected class under the statute; (3) the court lacked jurisdiction over the Illinois Human Rights Act claim because it was committed to the exclusive jurisdiction of the Illinois Human Rights Commission; (4) Plaintiff's failure to report to work constituted a legitimate basis for termination and thus precluded her retaliatory discharge claim; (5) ERISA preempted her claim under the Illinois Health Insurance Claim Filing Act.

Feldman now appeals the district court's grant of summary judgment on her ADA, ERISA and retaliatory discharge claims. She also appeals the denial of her motion to amend her complaint. For the reasons presented in the discussion below, we affirm the district court's decisions granting

summary judgment on all three claims and denying Feldman's motion for leave to amend her complaint.

## II. ANALYSIS

### A. Summary Judgment

We review the district court's grant of summary judgment *de novo*, drawing our own conclusions of law and fact from the record before us. *Haefling v. United Parcel Serv.*, 169 F.3d 494, 497 (7th Cir.1999). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, we must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, neither "the mere existence of some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, 106 S.Ct. 2505, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), is sufficient to defeat a motion for summary judgment. "A genuine issue of fact exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir.1999) (citation omitted).

### 1. ADA Claim and Judicial Estoppel

The ADA prohibits employer discrimination against an employee on the basis of a disability. 42 U.S.C. § 12112(a). The ADA both proscribes adverse employment treatment of an employee on the basis of the employee's physical or mental disability, 42 U.S.C. §§ 12112(b)(1)-(4), and imposes an affirmative duty on employers to make reasonable accommodations for the disabilities of an employee who can perform the essential functions of her job with or without accommodation. 42 U.S.C. §§ 12112(b)(5)-(7).

Feldman claims that Prairie States violated the ADA by failing to accommodate her disabilities. To establish a *prima facie* case for failure to accommodate under the ADA, Feldman must show that: (1) she was or is disabled; (2) Prairie States was aware of her disability; and (3) she is a qualified individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that she held with Prairie States. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996).

In granting summary judgment for Prairie States, the district court held that Feldman failed to establish that she was disabled. However, in our *de novo* review of summary judgment, we reserve opinion on the district court determination that Feldman was not "disabled." Instead, we evaluate whether Feldman's contention that she is a "qualified individual" under the ADA is precluded by her earlier declarations regarding her disability in her applications for SSDI benefits. We find this question dispositive here.

Feldman's claim under the ADA raises the issue of judicial estoppel examined in a case decided last term by the Supreme Court, *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). An applicant for SSDI benefits must establish that she is disabled under the Social Security Act and thus "not only unable to do [her] previous work but cannot ... engage in any other kind of substantial gainful work which exists in the national economy ..." 42 U.S.C. § 423(d)(2)(A). However, under the ADA, a claimant must establish

that she is a "qualified individual with a disability" who would have been able to "perform the essential functions" of her job "with or without a reasonable accommodation" from her employer. 42 U.S.C. § 12111(8). At first glance, a claim of total disability under SSDI might seem fundamentally inconsistent with status as a qualified individual under the ADA. The doctrine of judicial estoppel prevents a party from adopting a position in a legal proceeding contrary to a position successfully argued earlier by that party in a legal proceeding. *Ogden Martin Sys. of Indianapolis v. Whiting Corp.*, 179 F.3d 523, 526 (7th Cir.1999). As a result, before *Cleveland*, some circuits applied a strong presumption of judicial estoppel of an ADA claim after a previous application for or receipt of SSDI benefits. *See Cleveland v. Policy Mgt. Sys. Corp.*, 120 F.3d 513, 518 (5th Cir.1997); *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 618–20 (3d Cir.1996).

■ *Cleveland*, however, explained that the mere act of applying for SSDI should not estop a plaintiff from making a subsequent ADA claim. *Cleveland*, 119 S.Ct. at 1603. We have already ruled that claims under the ADA and SSDI are not so inconsistent that judicial estoppel is always appropriate. *Weigel v. Target Stores*, 122 F.3d 461, 467–68 (7th Cir.1997). Sufficient divergence exists between the definitions of "disability" under the ADA and SSDI that, in some circumstances, an individual can claim truthfully both that she is unable "to engage in any substantial gainful activity" under SSDI but also a "qualified individual with a disability" under the ADA. *See, e.g., Wilson v. Chrysler Corp.*, 172 F.3d 500, 504–05 (7th Cir.1999); *Weigel*, 122 F.3d at 467–68. *See also Rascon v. U.S. West Commun.*, 143 F.3d 1324, 1330–31 (10th Cir.1998); *Swanks v. Washington Metro. Area Transit Auth.*, 116 F.3d 582, 584 (D.C.Cir.1997).

The ADA and SSDI pursue different statutory purposes and require different, though related, inquiries into an individual's disability. First, SSDI provides a welfare safety net for those who are unable to work, regardless of employers' willingness to accommodate their disabilities, whereas the ADA serves a remedial purpose in opening work opportunities for the disabled by forcing employers to accommodate employees' disabilities so long as that does not impose an undue burden. The ADA only protects the disabled who can work with or without reasonable accommodation while SSDI does not consider reasonable accommodation at all in defining disability. Thus, an individual might be able to work with reasonable accommodation and therefore be a "qualified individual" under the ADA, but be unable to work without reasonable accommodation and thus "totally disabled" under SSDI as well.

Second, SSDI utilizes broad administrative definitions designed to process masses of claimants with only a general inquiry into each applicant's individual situation. The SSA categorically considers certain conditions to be disabilities without consideration of the individual's actual level of impairment. *See* 20 C.F.R. §§ 404.1520(d), 404.1525(a). In contrast, the ADA delves into the facts of each plaintiff's case within a litigation context to determine whether the plaintiff was unable to perform her particular job with or without reasonable accommodations for her condition. An individual might have a condition that the SSA considers categorically disabling, but be able to perform her job with or without reasonable accommodation because her condition is not terribly severe or disabling in fact.

Third, the severity of a disability may change over time such that an individual was totally disabled when she applied for SSDI, then later was a qualified individual at the time of the employment decision disputed in an ADA suit. Even though the underlying disability is the same, the SSDI application and the ADA suit might reference quite different points in time between which an improvement or deterioration in the plaintiff's disability may have transpired. Although an ADA suit must be

brought promptly after the relevant employment decision, it is possible that the passage of time and a concomitant change in the disability could explain an inconsistency between SSDI and ADA status.

Looking to these substantive differences among others, the Court in *Cleveland* decided that judicial estoppel ought not apply merely because an individual has applied for or received SSDI benefits. *Cleveland*, 119 S.Ct. at 1603 (enumerating scenarios where an individual could qualify under both the ADA and SSDI). Any inconsistency in making claims, without receiving benefits, under both the ADA and SSDI "is of the sort normally tolerated by our legal system." *Id.* Feldman's prior application for SSDI, by itself, does not estop her from making an ADA claim for the same underlying medical condition.

■ Judicial estoppel of an ADA claim, however, is distinguishable from summary judgment against the plaintiff when factual assertions essential to the claim are undermined by the plaintiff's previous sworn statements. Although *Cleveland* clarified that an ADA claim is not estopped simply because an individual applied for or received SSDI benefits, a plaintiff cannot avoid summary judgment merely by asserting that she is a qualified individual if she made prior statements, in applying for SSDI, regarding her disability that are squarely contradictory. A plaintiff may declare that she was totally disabled in her SSDI application, then declare that she was a qualified individual under the ADA, but she must show that this apparent inconsistency can be resolved with reference to variance between the definitions of "disability" contemplated by the ADA and SSDI. Thus, "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case—at least if she does not offer a sufficient explanation." *Id.*

■ Like the plaintiff in *Cleveland*, Feldman argues that her claim of complete disability in her application for SSDI benefits does not preclude her from establishing that she was a qualified individual under the ADA. In her SSDI application, however, Feldman swore unequivocally that she was "completely and totally disabled and cannot perform any substantial gainful employment." She declared that she could "barely move" and could not "work a six to eight hour day" because of pain, stiffness and fatigue. Her application stated that even "daily activities are really restrictive" because she had "virtually no use of her left hand" and felt such severe pain that it "restricted use of her upper extremities." Feldman admitted that she could not carry a briefcase or drive long distances as her job required. These declarations appear on their face to contradict her argument before the district court on her ADA claim that she was a qualified individual who could perform the essential functions of her job as a traveling salesperson. As we once explained, "[w]hen employees (and/or their physicians) represent that they are 'totally disabled,' 'wholly unable to work,' or some other variant to the same effect, employers and factfinders are entitled to take them at their word." *Weigel*, 122 F.3d at 467.

In her SSDI application, Feldman convinced the SSA of her total disability with unambiguous statements about her total incapacity to perform any substantial gainful employment. Feldman now explains flatly that she "was able to perform the essential functions of her job, with or without reasonable accommodations and, thus, was a 'qualified individual.'" This bald statement, without more, crashes face first against her claim of total disability in her SSDI application. We cannot permit litigants to adopt an alternate story each time it advantages them to change the facts. Feldman presented no explanation of the contradiction between her statements before the SSA and her statements to the district court on her ADA claim.

■ To avoid summary judgment under *Cleveland*, a plaintiff must resolve the ap-

parent inconsistency with an explanation which warrants a reasonable juror's conclusion that the plaintiff could perform the essential functions of her job, with or without reasonable accommodation, even assuming the truth of the earlier statement. *Cleveland,* 119 S.Ct. at 1604. Although we have already explained that contradictions between SSDI and ADA attestations might be explicable, and thus a plaintiff is entitled to account for such inconsistencies, we will not assume that such a contradiction can be resolved in the absence of direct explanation. The Court in *Cleveland* insisted that "[w]hen faced with a plaintiff's previous sworn statement asserting 'total disability' or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim." *Id.* Unlike the plaintiff in *Cleveland,* Feldman failed to offer any explanation for the contradiction between her SSDI and ADA statements. We therefore will affirm the district court's grant of summary judgment.

### 2. ERISA § 510

█ Section 510 of ERISA prohibits employers from frustrating their employees' attainment or enjoyment of benefit rights. It provides that "[i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which the participant may become entitled under the plan." 29 U.S.C. § 1140.

█ To establish a *prima facie* case under § 510, Feldman must show that she (1) belongs to the protected class; (2) was qualified for the position involved; and (3) was discharged or denied employment under circumstances that provide some basis for believing that prohibited intent existed. *See Little v. Cox's Supermarkets,* 71 F.3d 637, 642 (7th Cir.1995). The district court found that Feldman was not a member of the protected class because she was not eligible for the claimed benefits in the first place. This decision was correct.

To receive the long-term disability benefits that Feldman sought under her insurance policy, she must have been "totally disabled," as defined by her insurance policy, for the duration of a ninety-day elimination period. Measured from her first day of disability on November 4, 1994, Feldman would have been disabled for ninety days, and therefore become entitled to long-term disability benefits, on February 3, 1995. Fatal for her claim, Drs. Vitosky and Bauer issued letters that authorized her return to work in December and January, before the ninety-day period lapsed.

Feldman appears to believe that her termination preempted the tolling of the ninety-day period for qualification, but the doctors' releases made her ineligible for long-term disability benefits well before then. Feldman's termination and Prairie States' motivation for the termination are simply irrelevant. Feldman cannot establish a *prima facie* case under § 510 of ERISA because she was not a member of the protected class for long-term disability benefits. The district court did not err in granting summary judgment.

### 3. Retaliatory Discharge

█ In *Kelsay v. Motorola, Inc.,* 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353, 357–59 (1978), the Illinois Supreme Court established the tort of retaliatory discharge for exercising rights under the Illinois Workman's Compensation Act. The onus is on the employee to show affirmatively that her termination was motivated by unlawful intent to retaliate against her for exercising her statutory right. *See Heldenbrand v. Roadmaster Corp.,* 277 Ill. App.3d 664, 214 Ill.Dec. 405, 660 N.E.2d 1354, 1357 (1996). A claim that rests entirely on suspicious timing is insufficient to survive summary judgment. *See Juarez v. Ameritech Mobile Comm., Inc.,* 957 F.2d 317, 321 (7th Cir.1992).

Feldman claims that her termination by Prairie States was retaliation for her worker's compensation claim, yet she presents no affirmative evidence indicating any causal nexus between her worker's compensation claim and her termination. Indeed, Prairie States offers an entirely valid, nonpretextual basis for her discharge. Prairie States insisted that Feldman return to work by January 30, 1995, and she failed to do so. Employers who terminate an employee for absenteeism are not liable under Illinois law for retaliatory discharge, even if those absences stem from a legitimate disability. *See Hartlein v. Illinois Power Co.*, 151 Ill.2d 142, 176 Ill.Dec. 22, 601 N.E.2d 720, 728 (1992); *Slover v. Brown*, 140 Ill.App.3d 618, 94 Ill.Dec. 856, 488 N.E.2d 1103, 1105 (1986). *See also McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58, 60 (7th Cir.1990). Feldman's conclusory allegation, that Prairie States' stated basis for her termination was pretextual, is insufficient to survive summary judgment. We will affirm dismissal of Feldman's retaliatory discharge claim.

### B. Denial of Leave to Amend Plaintiff's Complaint

Under Rule 15(a) of the Federal Rules of Civil Procedure, the district court may grant leave to amend pleadings and such leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, leave to amend is "inappropriate where there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment." *Perrian v. O'Grady*, 958 F.2d 192, 194 (7th Cir.1992). We will reverse a denial of a motion to amend only if the district court has abused its discretion. *Id.*

Feldman moved for leave to add an additional defendant and an additional ERISA claim on September 29, 1997. This motion came six months after the March 7, 1997, close of discovery and three months after the district court set a briefing schedule for Prairie States' motion for summary judgment. Although Feldman argues that she did not discover the facts necessitating the amendment until April 28, 1997, she still did not file her motion to amend for another five months, on September 29, 1997. The prejudice to the new defendant and the delay to Prairie States, well after the close of discovery and on the eve of summary judgment proceedings, justified the district court's denial of Feldman's motion. Although the district court did not articulate its basis for decision, denial of a motion to amend pleadings without explanation does not constitute abuse of discretion if the delay and prejudice that would result from such amendment was apparent. *See Sanders v. Venture Stores*, 56 F.3d 771, 773–74 (7th Cir.1995). This was the case here.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the decisions of the district court granting Defendant's motion for summary judgment and denying Plaintiff leave to amend her complaint.