In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1134

JIMMY DALE LEE,

Plaintiff-Appellee,

v.

CITY OF SALEM, INDIANA,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Indiana, New Albany Division.
No. NA 97-117-C D/S--S. Hugh Dillin, Judge.

ARGUED JUNE 9, 2000--DECIDED August 1, 2001

  Before BAUER, POSNER, and ROVNER, Circuit
Judges.

  ROVNER, Circuit Judge.  After Jimmy Dale
Lee suffered a back injury that left him
unable to perform heavy physical labor,
the City of Salem, Indiana ("Salem" or
the "city") discharged him from his
position as sexton of the city's
cemetery. Lee sued the city pursuant to
the Americans with Disabilities Act
("ADA"), 42 U.S.C. sec. 12101, contending
that he remained able to perform his work
with or without accommodation. A jury
found in his favor and awarded him
damages. In the interim between his
discharge and the trial, however, Lee had
sought and obtained disability benefits,
asserting in his application that he was
unable to perform his past work as a
sexton. When queried about the
discrepancy at trial, Lee explained that
although he was, in fact, able to perform
his work, he had applied for benefits and
claimed an inability to work because his
disability had been "hammered into [his]
head" and "[he] believed that was the
only thing to do, sign up for
disability." R. 126 at 64-65. As a matter
of law, we find that explanation insuffi
cient to satisfy the criteria established
by Cleveland v. Policy Mgmnt. Sys. Corp.,
526 U.S. 795, 119 S. Ct. 1597 (1999), and
Feldman v. American Mem. Life Ins. Co.,
196 F.3d 783 (7th Cir. 1999), and
therefore reverse the judgment entered in

Lee's favor.

I.

Lee prevailed below after a full trial. We therefore recount the facts in the light most helpful to him, resolving testimonial conflicts in his favor and granting him the benefit of any inferences that the jury reasonably might have drawn from the evidence. E.g., Jannotta v. Subway Sandwich Shops, Inc., 125 F.3d 503, 505 (7th Cir. 1997).

Lee began work at Salem's Crown Hill Cemetery in 1978 and became sexton in 1992. He and the other cemetery workers prepared grave sites, tended the lawn with mowers and weed-eaters, and on occasion moved headstones. As sexton, Lee scheduled and supervised the labor of the small cemetery workforce, which included two full-time employees and himself, as well as a number of extra workers (up to four) who were hired during the summer months. He also sold burial plots, recorded the requisite information for burial permits, and directed people to grave sites.

In April 1994, Lee fell from a stand of bleachers while attending a race at a local speedway. He suffered several herniated disks as a result and underwent surgery to repair the damage. In March of 1995, Lee applied for Social Security Disability Insurance ("SSDI") benefits, indicating that he was unable to work. On December 29, 1995, following an evidentiary hearing, an administrative law judge ("ALJ") retroactively awarded Lee benefits for a closed period of disability commencing on the date of his injury and ending on August 13, 1994. Def. Ex. E.

On August 14, 1995, Lee returned to his job at the cemetery. His doctor had restricted him to light duty pending what was expected to be a complete recovery. Lee was not to lift more than 10 pounds, he was to avoid sitting for more than 30 minutes at a time, and he was not to engage in any repetitive bending. Def. Exs. H, I. According to Lee, even with these limitations, he was able to perform most, if not all, of the tasks associated with his position as sexton, and of course other employees were able to handle the heavy lifting. In May 1996,

however, Lee's physician determined that he would never be able to again perform heavy physical labor and prepared a disability form making his light-duty restrictions permanent. Def. Ex. J. Lee believed he was fully capable of staying on as sexton, and until this time, no one at the city had questioned his ability to do so.

Once Lee's limitations were deemed permanent, however, the city's position changed. Salem's clerk-treasurer, Judy Chastain, told Lee's wife Pam that when she delivered a copy of Lee's disability form to the city's mayor, Douglas Campbell, he remarked "Thank you very much, this is exactly what I need." R. 126 at 88. Mrs. Lee understood this to mean that Campbell viewed the letter as ammunition against her husband. A city councilman subsequently remarked to Lee's father-in-law that "they was going to have a council meeting, that Jimmy Lee was crippled, [and] they was going to have to get shed of him." Id. at 156. When the council subsequently met in executive session on June 10, 1996, Mayor Campbell informed council members of Lee's permanent restrictions. They, in turn decided to discharge Lee and instructed the mayor to explore the possibility of offering Lee employment elsewhere within the city's workforce./1

At a subsequent, public meeting on June 25, the city's attorney explained to the council that the ADA required it to identify the essential functions of Lee's position, to consider whether Lee was able to perform those functions, and, if not, to consider whether the city could make any accommodations that would enable Lee to continue working without posing an undue burden upon the city. Heeding their counsel's advice, the council determined first that the essential functions of the sexton position included record management, grave sales, mowing, backhoe operation, general maintenance and labor, and supervision of labor. The four council members present (one did not attend the meeting) then discussed whether Lee could perform each of these functions under the permanent restrictions articulated by his physician and concluded, unanimously, that he could not. After concluding that no reasonable accommodation was possible, the council voted (again, unanimously) to relieve Lee

of his position. Lee and his attorney were present at this meeting. Lee told the council that he was able to continue on as sexton, and that the list of functions that council members had deemed essential to the position were not consistent with the duties historically associated with the position. Each of the funeral directors who used the cemetery, as well as a cemetery customer and a number of Lee's co-workers, also indicated that the cemetery was functioning satisfactorily with Lee in charge. Nonetheless, the council removed Lee from the post.

At its June 10th meeting, the council had authorized Mayor Campbell to offer Lee a job as a police dispatcher. Campbell mentioned the job to Lee, but the city council never went so far as to offer him the position. After voting to discharge Lee at the June 25th meeting, the council did provide for the creation of a part-time position for Lee at the cemetery entailing the management of cemetery records, lot sales, coordination with funeral directors, and working with the general public. Campbell was instructed to work out the details with Lee. Nothing came of this proposal either. As of July 15, 1996, Lee was discharged from the city's employ.

After losing his job, Lee sought disability benefits for the second time. A disability report dated August 12, 1996 indicated that he had been disabled since July 15, 1996, the final day of his employment with Salem. The report described the permanent restrictions that his physician had imposed on him and indicated that he was in "constant pain." Pl.'s Ex. 8 at 1. The report also indicated that Lee had attempted to return to work, but that "they wouldn't let me operate the heavy equipment anymore, i.e., backhoe, mowing tractor, dump trucks." Id. The final section of the report contained the following remarks:

I was awarded a closed period of disability in Jan. of 1996. I went back to work to see if I couldn't handle it but I couldn't do the work anymore. It was too strenuous for me and my back pain is just too great to keep agrivating [sic] it every day. I gave it my best try.

Id. at 6. Just below these remarks, Lee signed the report. A heading adjacent to the signature line stated: "Knowing that anyone making a false statement or representation of material fact for use in determining a right to payment under the Social Security Act commits a crime punishable under Federal law, I certify that the above statements are true." Id.; see 18 U.S.C. sec. 1001; 42 U.S.C. sec. 408.

Following the initial denial of his claim, Lee requested a hearing before an ALJ, stating in part that "I feel I am disabled and unable to work due to the severity of my back problem." Def. Ex. D. The ALJ held in Lee's favor and awarded him benefits commencing as of July 15, 1996. Def. Ex. G. Among other things, the ALJ found that (1) Lee suffered from degenerative disc disease that "prevents the claimant from performing anything but a drastically restricted range of sedentary work"; (2) he "cannot perform his past relevant work and does not have transferable skills to perform other work within his residual functional capacity"; and (3) "there are no jobs existing in significant numbers that the claimant is capable of performing." Id., Decision at 2.

In June 1997, while his application for disability benefits was pending, Lee filed suit contending that the city'shandling of his disability violated the ADA. He sued Campbell as well as the city, alleging that the mayor had tortiously interfered with his employment contract.

At trial, Lee was asked about the assertions in his signed disability report that he "couldn't do the work anymore," that his job as sexton was "too strenuous for [him]" and that his "back pain was just too great to keep [aggravating it] every day." "Was that true when you signed that form?" Lee's attorney asked him.

A. I believe[d] it to be true, yes.

Q. Is it true today?

A. I don't agree with it, no.

Q. Why don't you agree?

A. Well, again, all the pressure was on and I believe I could do the job.

Q. Do you believe you could do the job today?

A. Yes, yeah.

Q. Do you believe you could do the job with your restrictions today?

A. Yes.

Q. Do you believe that you could do the job back in June of 1996?

A. Yes.

Q. Do you believe you were doing the job?

A. Yes, I believe I was doing the job very well.

Q. Were there any parts of your job that because of your restrictions you totally couldn't do?

A. No.

Q. What made you able to do that job with your restrictions?

A. Well, I mean, as far as, you know, I know how to do the job. I had done it long enough, the past experience and everything, it was--I could figure out how to do the job somehow or another.

Q. Did you get the job done?

A. Yeah, I done my job, yes.

R. 126 at 49-50. On cross-examination, Lee indicated that he had not filled out the disability report himself, but rather that a Social Security representative had done so on his behalf. He acknowledged however, that he told the representative that he "couldn't do the work anymore." Id. at 58. Defense counsel asked Lee whether it was true in mid-1997, when he asked for a hearing on his claim, that he was unable to work.

A. I did my work. I felt the reason I made those statements was that everybody kept hammering me and saying you were disabled, and whatever, and then these people, that is what they do is write it

up for--they write out the request for you. And I feel like I had no other just thing to do but just agree, you know, file for disability. That is what was hammered in my head.

Id. at 62-63. Lee sounded the same note when he was asked about the ALJ's finding, in December of 1997, that he was unable to perform his past work:

Q. And do you agree with that, that as of December of 1997, you were unable to perform, quote "[y]our past relevant work"?

A. At the time I did that I believed that because it was hammered into my head, but now I'm not.

Q. I'm sorry, I didn't hear that[.]

A. But no, now I don't agree with it, no.

Q. You do now, but--you don't now, but you did then?

A. I was fired from my job because of that reason and I believed that was the only thing to do, sign up for disability.

Id. at 64-65.

At the close of Lee's case, the city asked the court to enter judgment as a matter of law in its favor on the ADA claim pursuant to Federal Rule of Civil Procedure 50. Relying on the Supreme Court's decision in Cleveland v. Policy Mgmnt. Sys. Corp., supra, decided just three weeks earlier, the city contended that Lee was obliged to explain the apparent discrepancy between his successful application for disability benefits--which posited that he was unable to perform his past work as a sexton--and his ADA claim--which posited that he was still able to perform the essential functions of the job. R. 126 at 204-05. The court took the motion under advisement. Id. at 211. The city renewed its motion at the end of the case, but the court denied the motion. R. 97. The jury found in favor of Lee on the ADA claim, in favor of Campbell on the tortious interference claim, and awarded Lee $112,000 in lost wages and benefits, $50,000 for emotional distress, and punitive damages of $50,000. R. 99. On post-trial motions, the district court

struck the award of punitive damages, denied Lee's request for an order reinstating him to his job, and granted Lee $8,082.30 in front pay as well as attorney's fees and costs of $24,672.94, bringing the total award to Lee to $194,755.24. R. 115, 116, 127. Although Salem again argued that it was entitled to judgment as a matter of law based on Lee's prior claim of total disability (R. 104 at 9, 10-12), the district court again rejected the argument:

The jury disagreed with the City's position, and found that Lee, with or without reasonable accommodation, could perform [the physical duties of sexton]. Viewing the evidence presented at trial in Lee's favor, as well as drawing all reasonable inferences in his favor, the Court finds that the jury's conclusion was reasonable.

R. 115 at 10.

II.

Salem attacks the judgment on a variety of grounds, but we need only reach its first and principal argument. When Lee sought disability benefits following his discharge, he represented to the Social Security Administration that he was no longer able to work as a sexton. There is no dispute that this representation, which the ALJ found to be true in awarding Lee benefits, posed an apparent conflict with an essential element of his ADA claim--namely, that he could perform the essential functions of his past work with or without reasonable accommodation. Cleveland v. Policy Mgmnt. Sys. Corp., 526 U.S. 795, 119 S. Ct. 1597 (1999), required Lee to explain the discrepancy. The question posed to us is whether the explanation that Lee offered was sufficient to establish a fact question as to his ability to continue working as a sexton. If not, then Salem was (and is) entitled to judgment as a matter of law.

A.

Whereas the Social Security Act provides an income to disabled persons who cannot work, the ADA protects the employment rights of those who can. The separate aims of the two statutes are reflected in their criteria. In order to qualify for disability benefits, an individual must

show both that he is "unable to do his previous work" and that he "cannot . . . engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. sec. 423(d)(2)(A). But in order to establish a prima facie case of discrimination under the ADA, one must show that he is a "qualified individual with a disability," that is, one who can, notwithstanding his disability, perform the essential functions of his job with or without reasonable accommodation. 42 U.S.C. sec. 12111(8) (emphasis supplied); see also, e.g., Emerson v. Northern States Power Co., No. 00-3746, 2001 WL 710296, at *5 (7th Cir. June 26); Webb v. Clyde L. Choate Mental Health & Dev. Ctr., 230 F.3d 991, 999 (7th Cir. 2000). At first blush, then, one might think that a successful application for SSDI benefits forecloses an ADA claim. How can one claim the ability to do his job, as the ADA requires, if he has convinced the Social Security Administration that he is unable to work?

The apparent conflict can be reconciled, however, as the Supreme Court recognized in Cleveland. The question posed in Cleveland was whether one's successful pursuit of SSDI benefits either estops him from pursuing an ADA claim or triggers a presumption that he is unable to perform the essential functions of his job. The Court unanimously concluded that it does neither of these things. As Justice Breyer explained, the SSA and the ADA do not employ the same criteria in assessing the individual's ability to work. For example, the ADA envisions that someone with a disability may be able to work, but only with a reasonable accommodation (e.g., job restructuring, reassignment to a different position, part-time work, and so forth). The SSA, on the other hand, does not take potential accommodations into account in assessing one's ability to continue working. 526 U.S. at 803, 119 S. Ct. at 1602. The ADA also calls for an individualized inquiry into a person's ability to perform the essential functions of her job, whereas the SSA incorporates a number of presumptions about the impact of various disabilities--certain listed impairments are deemed disabling per se, for example, although a given person with one of those impairments might, in reality, retain the

ability to work at some jobs. 526 U.S. at 804, 119 S. Ct. at 1602-03. Thus, a claim for disability benefits asserting that the applicant is no longer capable of gainful employment "often implies a context-related legal conclusion, namely 'I am disabled for purposes of the Social Security Act.'" Id. at 802, 119 S. Ct. 1601. So understood, a quasi-legal assertion of this kind does not foreclose the possibility that the individual is nonetheless "qualified" to work for purposes of the ADA. Moreover, disabilities can change over time. Thus, a person might be unable to work at the time he applies for, and receives, SSDI benefits, and yet later regain the ability to work. 526 U.S. at 805, 119 S. Ct. at 1603. In sum, one might be deemed unable to work for purposes of SSDI benefits and yet still be able to show that she could perform the essential functions of her job for purposes of the ADA. So the application for and award of benefits is not dispositive of an ADA claim.

Yet, as the Court went on to recognize, there are situations in which a successful claim for SSDI benefits will appear to pose a genuine conflict with an ADA claim; and in such cases, the ADA plaintiff may not ignore the seeming conflict. 526 U.S. at 805-06, 119 S. Ct. at 1603./2 "[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case--at least if she does not offer a sufficient explanation." Id. at 806, 119 S. Ct. at 1603. As in any case in which a party attempts to create a genuine issue of fact by contradicting his own prior statement under oath, see, e.g., Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995), an ADA plaintiff who has obtained SSDI benefits by making a sworn statement to the effect that he is completely disabled and thus unable to work must confront and reconcile the apparent inconsistency between that assertion and his ADA claim, the premise of which is that he can work. 526 U.S. at 806-07, 119 S. Ct. at 1603-04.

To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's

good faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

Id. at 807, 119 S. Ct. at 1604./3

   Cleveland's analysis suggests that an ADA plaintiff may not, simply by disavowing a prior claim of total disability, perform an about-face and assert that he is a "qualified individual" who is capable of working. Rather, as the language we have just quoted indicates, the plaintiff must proceed from the premise that his previous assertion of an inability to work was true, or that he in good faith believed it to be true, and he must demonstrate that the assertion was nonetheless consistent with his ability to perform the essential functions of his job. Ibid. The key to meeting that burden lies in the very differences between the two statutory schemes that led the Supreme Court to reject a rule foreclosing a cause of action under the ADA to anyone who had previously obtained SSDI benefits. In other words, as we stated in Feldman v. American Mem. Life Ins. Co.:

A plaintiff may declare that she was totally disabled in her SSDI application, then declare that she was a qualified individual under the ADA, but she must show that this apparent inconsistency can be resolved with reference to variance between the definitions of 'disability' contemplated by the ADA and SSDI.

196 F.3d 783, 791 (7th Cir. 1999) (emphasis supplied); see also Jessica Barth, Note, Disability Benefits and the ADA after Cleveland v. Policy Management Systems, 75 Indiana L. J. 1317, 1343, 1345-46 (2000). The plaintiff might point out, for example, that because the Social Security Administration does not consider whether a claimant could perform his past work if his employer made reasonable efforts to accommodate his disability, his claim that he was unable to do the job leaves open the possibility that he might be able to meet the essential criteria of the position if he were accommodated. See Cleveland, 526 U.S. at 807, 119 S. Ct. at 1604. Or he might offer evidence that although he was

unable to work at the time he applied for disability benefits, the severity of his disability had lessened since that time and so enabled him to return to work, with or without accommodation. See ibid. Explanations of the sort Cleveland requires are, in short, contextual--they resolve the seeming discrepancy between a claim of disability and a later claim of entitlement to work not by contradicting what the plaintiff told the Social Security Administration, but by demonstrating that those representations, understood in light of the unique focus and requirements of the SSA, leave room for the possibility that the plaintiff is able to meet the essential demands of the job to which he claims a right under the ADA. See id. at 802, 119 S. Ct. at 1601-02.

B.

The unmistakable import of Lee's post-termination application for disability benefits is that he was unable to continue working as a cemetery sexton. "I went back to work to see if I couldn't handle it but I couldn't do the work anymore," he told the Social Security Administration. Pl. Ex. 8 at 6. The ALJ's findings in Lee's favor likewise reflect this fundamental assertion: the ALJ found that Lee's injury left him able to perform only a "a drastically restricted range of sedentary work," that consequently Lee could not perform his past relevant work as a sexton, and that there were no other jobs in significant numbers that Lee was capable of performing. Def. Ex. G, Decision at 2. Lee's asserted inability to meet the demands of his job thus calls into question whether or not he is a "qualified individual" for purposes of the ADA. Cleveland, 526 U.S. at 805-06, 119 S. Ct. a 1603. In order to establish a question of fact as to his ability to perform the essential functions of his job, Lee was required to explain the apparent discrepancy with reference to the divergent definitions of disability set forth in the SSA and the ADA. Feldman, 196 F.3d at 791.

Lee's explanation, however, does not turn on the distinctions between the two statutory schemes. Rather than reconciling his claim for disability benefits with the criteria of the ADA,

Lee has attempted to abandon altogether the assertions that he made to the Social Security Administration. By Lee's account at trial, he was doing the job of a sexton at the time Salem discharged him, and was still able to do that work when he re-applied for disability benefits two months later. Even so, he pursued and obtained disability benefits on the premise that he could not return to his past work, because he was convinced that he could not do so: Salem had deemed him unfit to continue on as the city's sexton, it had been "hammered into [his] head" that he was disabled, and so he simply did the logical thing and applied for benefits. R. 126 at 62-63. "I was fired from my job because of that reason and I believed that was the only thing to do, sign up for disability." Id. at 65.

We are obliged to review the record in Lee's favor, and so we accept his testimony as true. We may safely assume, in turn, that Lee was not deliberately distorting the truth when he represented that he was unable to return to his job at the city cemetery. Still, the unavoidable implication of his testimony is that what he told the Social Security Administration and the ALJ was untrue. Yet, the notion that he was no longer able to work as a sexton was obviously crucial to the ALJ's disability determination. Having secured an award of disability benefits on the strength of that assertion, Lee has turned about and asked a jury, and now this court, to grant him relief based on a wholly contrary view of his ability to work. We reiterate that Lee does not account for his previous statements by explaining, for example, that the SSA does not consider the possibility of reasonable accommodations, so that when he claimed he was unable to return to his job with the city, he was simply saying that he could no longer do that job unless the city accommodated him, which it refused to do. Lee has not attempted to qualify his prior statements at all. Instead, he accepts the natural import of those statements (that he could no longer work as a sexton, period), contends that he so believed at the time he applied for benefits, and indicates that he has since had a change of heart. His brief makes the point succinctly: "Lee was able to do the job, did the job, knew he could do the job, was told he couldn't do the job,

filed for social security, and at the time of trial, told the jury he could do the job." Lee Br. at 6.

   Cleveland indicates that a sworn statement declaring one's "total disability" (or the like) can comfortably coexist with an ADA claim asserting the ability to perform the essential functions of the job when the plaintiff proffers "a sufficient explanation" for the seemingly contradictory positions. 526 U.S. at 806, 119 S. Ct. at 1603 (emphasis supplied). Our opinion in Feldman reveals that a sufficient explanation is one that "resolve[s] [the inconsistency] with reference to variance between the definitions of 'disability' contemplated by the ADA and SSDI." 196 F.3d at 791. The explanation that Lee proffered does not meet this criterion. As a result, Lee failed to establish a dispute of fact with respect to an essential element of his prima facie case under the ADA--his ability to perform the essential functions of his former position at the cemetery. Left unexplained, the sworn assertions in his SSDI application to the effect that he was unable to return to that job negated this element of his ADA claim. The jury, in turn, did not have an adequate basis on which to find that he was able to continue working as a sexton, with or without reasonable accommodation. The city was entitled to judgment as a matter of law.

   We are not saying that under no circumstances could the types of representations Lee made to the Social Security Administration have been reconciled with an ADA claim. For example, when Lee averred that his work at the cemetery was "too strenuous" and that his "back pain [was] just too great to keep ag[gra]vating it every day," he might have meant that he could no longer work as a sexton unless he was relieved of the aspects of the job involving physical exertion. Qualified in this way, such statements arguably left room for the notion that Lee was capable of performing the essential functions of the job (provided, of course, that the physically demanding activities themselves were not essential to the position). See, e.g., Fox v. General Motors Corp., 247 F.3d 169, 178 (4th Cir. 2001); E.E.O.C. v. Stowe-Pharr Mills,

Inc., 216 F.3d 373, 379 (4th Cir. 2000). But nowhere in Lee's testimony (or, for that matter, in his brief) do we detect that kind of contextual explanation for the evident discrepancy between his two claims. As we have said, Lee's testimony does not purport to in any way qualify his representations to the Social Security Administration. Instead, the thrust of his testimony is that he told the Social Security Administration that he was no longer capable of working as a sexton because that notion had been "hammered" into his head and he therefore accepted it as true at that time when, in reality, there was no aspect of his job that he was incapable of doing. It was, in short, his own change of heart that Lee offered to explain the inconsistency between his SSA and ADA claims rather than any differences in the statutory criteria that govern those two claims.

Perhaps what Lee wishes to argue is that although his prior statements to the SSA were inaccurate, he reasonably and in good faith believed them to be true based on the city's own decision that he was no longer able to meet the demands of his job, and so we ought not bind him to a position that, with the benefit of hindsight, he now realizes was a mistake. Cleveland, after all, requires the plaintiff to demonstrate how he can perform the essential functions of his job if one "assum[es] the truth of, or the plaintiff's good faith belief in," the statements he made when seeking disability benefits. 526 U.S. at 807, 119 S. Ct. at 1604 (emphasis supplied). Why, then, can not Lee reconcile the apparent inconsistency by explaining that he genuinely assessed his own ability to continue working at the cemetery differently in the immediate wake of his discharge than he does now? The answer is implicit in Cleveland. It was the specter of individuals hopping from forum to forum, making contradictory assertions under oath, that had convinced a number of lower courts, prior to Cleveland, to say that individuals who obtain SSDI benefits on the theory that they are unable to work ought to be estopped from proving that they can, in fact, perform the essential functions of their jobs for purposes of the ADA, or at the very least should be presumed unable to do so. See, e.g., McNemar v. Disney Store, Inc., 91 F.3d 610, 617-20 (3d Cir. 1996), cert.

denied, 519 U.S. 1115, 117 S. Ct. 958 (1997) (cited in Cleveland, 526 U.S. at 800, 119 S. Ct. at 1601); see also Wilson v. Chrysler Corp., 172 F.3d 500, 504 (7th Cir. 1999). In rejecting this approach, the Supreme Court nowhere spoke of a change of heart akin to Lee's as an acceptable way to reconcile the potential inconsistency between SSDI and ADA claims. The only legitimate explanations that the Court recognized were those turning on the distinct legal (and sometimes temporal) contexts of these claims. 526 U.S. at 802-05, 119 S. Ct. at 1602-03. The conclusion we reached in Feldman was therefore obvious: a plaintiff must explain the apparent discrepancy with reference to the divergent treatments of disability reflected in the SSA and ADA. 196 F.3d at 791. It is possible that Cleveland's use of the term "good faith" leaves room for a narrow category of alternative explanations. A mistaken diagnosis, belatedly discovered, for example, might enable an ADA plaintiff to retract the representation of total disability she made to the Social Security Administration in the same way that a plaintiff whose condition has improved since the time he applied for SSDI benefits is not forever hamstrung by his prior statement. See Cleveland, 526 U.S. at 805, 119 S. Ct. at 1603. But that is not Lee's case. Lee, who by his own account was doing the work of a sexton and doing it well, made a knowing decision upon his discharge to apply for disability benefits on the theory that he could not do the work. Now, he wishes to take back the very representations that convinced an ALJ to award him disability benefits. Cleveland and Feldman do not recognize Lee's proffered explanation as a sufficient one.

We wish to point out that our holding does not force individuals in Lee's situation to confront "the Hobson's choice of disability or poverty." Wilson, 172 F.3d at 506, quoting DeGuiseppe v. Village of Bellwood, 68 F.3d 187, 192 (7th Cir. 1995). Obviously, it was not Lee's decision to leave the city's employ, and it may well be, as the jury determined, that he was perfectly capable of doing his job. At the same time, if that was the only work Lee was capable of doing, then his discharge placed him in a difficult situation. But he was not

compelled to make an irrevocable choice
to pursue either SSDI benefits or an ADA
claim. A qualified individual with a
disability who is tossed out of work may
seek relief under both statutory schemes,
so long as the positions he takes in
pursuing these avenues of relief can be
reconciled in the ways that Cleveland and
Feldman recognize. He may not, however,
make contradictory representations
regarding his ability to work and
rationalize the conflict with no more of
an explanation than his own change of
mind.

III.

Because Lee failed to establish a
question of fact with respect to his
ability to perform the essential
functions of his past work as a sexton,
the district court should have entered
judgment as a matter of law in favor of
Salem. We REVERSE the judgment in favor of
Lee and against Salem and REMAND the case
with directions to enter judgment in the
city's favor.

FOOTNOTES

/1 Although the city takes the position that the
council did not decide to discharge Lee until its
public meeting on June 25, Mayor Campbell's
testimony indicates that the council resolved to
terminate him from the sexton position on June
10. R. 126 at 112-13.

/2 The Court limited the scope of its opinion to
successful benefit applications:

[I]f an individual has merely applied for, but
has not been awarded, SSDI benefits, any incon-
sistency in the theory of the claims is of the
sort normally tolerated by our legal system. Our
ordinary rules recognize that a person may not be
sure in advance upon which legal theory she will
succeed, and so permit parties to "set forth two
or more statements of a claim or defense alter-
nately or hypothetically," and to "state as many
separate claims or defenses as the party has
regardless of consistency." Fed. Rule Civ. Proc.
8(3)(2). We do not see why the law in respect to
the assertion of SSDI and ADA claims should
differ. . . .

526 U.S. at 805, 119 S. Ct. at 1603.

/3 Cleveland, like this case, involved prior state-
ments regarding the plaintiff's ability to work--
statements which, as noted above, "often imply a

context-related legal conclusion" regarding one's eligibility for SSDI benefits. 526 U.S. at 802, 119 S. Ct. at 1601-02. Cleveland did not address purely factual statements that a plaintiff may previously have made concerning the effects of his disability--e.g., "I cannot lift more than 10 pounds," or "I cannot stand for more than 15 minutes at a time." See ibid. Conflicts involving these types of straightforward, factual representations are governed by an established body of precedent that Cleveland left undisturbed. See generally McNamara v. City of Chicago, 138 F.3d 1219, 1225 (7th Cir.) (judicial estoppel), cert. denied, 525 U.S. 981, 119 S. Ct. 444 (1998); see, e.g., Mitchell v. Washingtonville Cent. School Dist., 190 F.3d 1, 6-8 (2d Cir. 1999) (finding that statements plaintiff made in seeking SSDI benefits, which asserted that he could not stand for prolonged periods, estopped him from asserting otherwise in pursuit of ADA claim); see also Wilson v. Chrysler Corp., 172 F.3d 500, 505-06 (7th Cir. 1999) (plaintiff's concession, in application for SSDI benefits, that she suffered from paranoid schizophrenia, estopped her from contending that her employer's stated reason for terminating her--her medicalcondition--was pretextual).