

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-8-2003

# Detz v. Greiner Ind Inc

Precedential or Non-Precedential: Precedential

Docket No. 02-3752

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Detz v. Greiner Ind Inc" (2003). *2003 Decisions.* Paper 167.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/167

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed October 7, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3752

RALPH B. DETZ,

Appellant

v.

GREINER INDUSTRIES, INC.

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 01-cv-05096)
District Judge: Honorable Franklin S. VanAntwerpen

Argued July 29, 2003

Before: SCIRICA, *Chief Judge*, RENDELL and
AMBRO, *Circuit Judges*.

(Filed: October 7, 2003)

James A. Nettleton, Jr.
Jerome C. Finefrock [ARGUED]
Nettleton & Finefrock
1834 Oregon Pike
Lancaster, PA 17601
*Counsel for Appellant*

Rory O. Connaughton [ARGUED]
Hartman, Underhill & Brubaker
221 East Chestnut Street
Lancaster, PA 17602
*Counsel for Appellee*

## OPINION OF THE COURT

RENDELL, *Circuit Judge.*

Ralph Detz lost his job with Greiner Industries on November 26, 1997. Detz subsequently convinced the Social Security Administration ("SSA") that, as of the date of his termination by Greiner, he was "disabled" and "unable to work." Detz was awarded Social Security Disability Insurance ("SSDI"), and he continues to collect those benefits. In 2001 Detz brought an action against Greiner alleging wrongful termination in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). To establish a prima facie case under the ADEA and the PHRA, Detz asserts that, at the time of his termination, he was qualified for the position he held at Greiner and was capable of continuing to perform it.

The District Court found that Detz was judicially estopped from proceeding on his claim of age discrimination, due to his earlier statements to the SSA regarding his disability and inability to work, and granted summary judgment in favor of Greiner on all claims. The issue before us is whether Detz's statements regarding his disability for SSDI purposes should preclude his subsequent claim that, for the purposes of the ADEA and the PHRA, he was "qualified" for his position at Greiner and can thus pursue a wrongful termination action under the ADEA and PHRA. We hold that his failure to adequately reconcile the two contrary positions is fatal to his prima facie showing of age discrimination, and we will, therefore, affirm.

## I.

Greiner Industries, Inc., is a mechanical contractor and manufacturer located in Mount Joy, Pennsylvania. As such, Greiner's work force engages in a variety of construction-related services throughout Lancaster County, including welding, duct work, structural steel fabrication, and sand

blasting. Due to the cyclical nature of work in the construction industry, Greiner periodically suffers downturns in its business and, in response, occasionally reduces the size of its work force.

Ralph Detz was employed by Greiner Industries on three separate occasions beginning in 1979. Each of these periods of employment ended when Detz was let go due to downturns in Greiner's business. His last and most lengthy period of employment at Greiner began in 1989 and ended with his layoff on November 26, 1997. Detz usually was employed as a millwright on Greiner's road crew. In this capacity, his duties included installing, servicing, and repairing machinery; welding steel for duct work; installing duct work and insulation; and setting up rigging to move construction equipment. According to Detz, this position involved the use of machines and tools, the application of technical knowledge, significant amounts of walking, and frequent lifting and carrying of objects weighing over fifty pounds. In addition, he was often required to work overtime.

On December 5, 1994, Detz injured his left hand and arm. Despite several attempts to repair the damage through surgery, he continues to suffer from permanent nerve damage and weakness in his injured hand and arm. This injury rendered Detz unable to perform his duties as a millwright, as they involved heavy lifting and manipulating equipment using both hands. According to Detz, his injury is permanent, and it is neither improving nor worsening.

When employees are recovering from injuries, Greiner typically assigns them to its Tool Room for "light duty work," which includes processing shipments and delivering materials to other workers. Employees remain in the Tool Room until they are able to return to their regular positions. Pursuant to this practice, Detz was placed in the Tool Room when he sought to return to work in April of 1995. He remained there, taking time off for surgeries on at least two occasions, until October of 1997, when he began to complain of harassment by the Tool Room supervisor. Detz also asserted that Greiner was failing to follow the medical restrictions placed on Detz in the wake of his injury. Although an internal investigation found that the

claims were unsubstantiated, Detz was moved to work in a temporary office trailer, where his duties involved copying and making deliveries.

Greiner eliminated a total of sixty-one positions between April and December of 1997 as a result of a downturn in business, through layoffs, retirements, and terminations for cause. Detz was laid off on November 26, 1997.

On April 25, 1998, Detz filed a Disability Report and an Application for Disability Insurance Benefits ("Application") with the SSA. The Disability Report contained information about his condition, his medical history, his usual activities, and the work he had been doing. On this report, Detz described his "disabling condition" as "loss of use of left hand and arm; high blood pressure; lung problems, depression." He indicated that he stopped working due to his condition on the date of his layoff. In response to a question asking the applicant to "[e]xplain how [his] condition now keeps [him] from working," Detz stated the following: "I can't lift over 20 lbs. Can't use left repetatively [sic]. I drop things easily with left hand."

Later in the Disability Report, in describing the work he had previously done, he listed both his position as a millwright and his job in the Tool Room. However, when responding to subsequent questions asking the applicant to further describe the duties of his previous work, Detz referred exclusively to his position as a millwright. For instance, he described his basic duties this way: "I welded steel for duct work and building construction. I set up rigging to move equipment." He went on to indicate that he spent eight hours a day walking, that he sometimes worked between ten and fourteen hours a day, that he carried rigging and duct work up to twenty-five feet, and that he frequently lifted more than fifty pounds. He did not describe his duties in the Tool Room or in the temporary office trailer anywhere in the report.

His accompanying Application for SSDI indicated that he "became unable to work because of [his] disabling condition" on the date of his termination, and that he was "still disabled" at the time of his Application. The Application, signed by Detz, contains the following acknowledgment:

> I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under federal law by fine, imprisonment or both. I affirm that all information I have given in connection with this claim is true.

The SSA denied Detz's initial claim, finding that his disability did not keep him from working in the Tool Room. The SSA also refused his subsequent Request for Reconsideration, which again indicated that he was "disabled and unable to work."

On November 9, 1998, Detz requested a hearing before an administrative law judge, where he might introduce additional evidence in support of his Application for SSDI. In requesting a hearing, Detz asserted for the third time that he was "disabled and unable to work." A Senior Staff Attorney at the SSA reviewed Detz's Application, as well as medical reports from several doctors who had examined Detz. In a December 2, 1998, decision, the SSA granted Detz's Application for SSDI, finding that Detz had been disabled since the date of his layoff by Greiner. The SSA arrived at its conclusion after applying the five-step analysis used to determine SSDI eligibility.[1] *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 804 (1999) (discussing the questions asked at each of the five steps). Specifically, the SSA found, under Steps Four and Five, that Detz "either ha[d] no past relevant work or [was]

---

1. The five-step procedure consists of the following set of inquiries: (1) Is the applicant presently working? If so, he is ineligible. (2) Does the applicant have a "severe impairment" that "significantly limits" his ability to perform basic work activities? If not, he is ineligible. (3) Does the applicant's impairment match one that is included on a list of specific impairments compiled by the SSA? If so, he is eligible and the inquiry ends here. (4) If the applicant's impairment is not on the SSA list, can he perform his "past relevant work?" If so, he is ineligible. (5) If the applicant's impairment is not on the list and he cannot perform his "past relevant work," can he perform other jobs that exist in significant numbers in the national economy? If not, he is eligible. *See* 20 C.F.R. §§ 404.1520(b)-(f), 404.1525, 404.1526, 404.1560(b)-(c) (2002); *Cleveland*, 526 U.S. at 804.

unable to perform the past relevant work," and that "no occupations exist[ed] in significant numbers which [Detz could] perform." *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1560(b)-(c) (2002). Thus, Detz was awarded SSDI benefits retroactively, beginning on November 26, 1997, and he currently continues to receive those benefits. On February 3, 1999, a final order confirming the SSA's decision was entered on the issue of Detz's disability.

On January 28, 1998, Detz filed complaints with the Pennsylvania Human Relations Commission ("PHRC") and the Equal Employment Opportunity Commission ("EEOC") alleging age discrimination by Greiner. In doing so, Detz submitted a Non-Job Related Handicap/Disability Questionnaire ("Questionnaire") to the PHRC detailing the basis for his complaint. He indicated that prior to his termination he had been treated differently and harassed at work due to his age and his disability, which he described as "loss of use of [his] left hand, and arm." He noted that the disability was permanent, but was not worsening, and that he received workers' compensation after his injury.

In response to questions about his job, he described his work in the Tool Room, never mentioning, as he had on the SSDI Application, the duties that accompanied his prior position as a millwright. He described "the job in question" as follows: "A tool room helper receives packages [and] shipments, unpacks materials [and] distributes them. Also, a tool room helper may help get tools for other employees. I can do most duties within restrictions." The restrictions to which he refers were set by various doctors who treated his injury, and they include permanent limits on how much Detz should lift. His complaint alleges that Greiner "refuse[d] to follow the restrictions." The following acknowledgment appears above Detz's signature on the PHRC Questionnaire: "I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties . . . relating to unsworn falsification to authorities."

The EEOC eventually dismissed Detz's charges, as did the PHRC, and Detz was advised of his right to sue Greiner. Detz initiated this action in the District Court for the

Eastern District of Pennsylvania with a complaint filed on October 9, 2001, alleging violations of the ADEA, 29 U.S.C. §§ 621-634, and the PHRA, 43 Pa. Cons. Stat. §§ 951-963. In his First Amended Complaint, Detz asserted that he was fifty-nine years old at the time of his discharge, and that he was replaced by someone who was under forty years old. He specifically alleged that he had "performed in his position for over nine . . . years and was fully qualified for the position." Furthermore, he alleged that the circumstances surrounding his discharge demonstrated that the reason given by his employer for his termination — lack of work — was pretextual. Detz sought various forms of relief, including damages and reinstatement.

Greiner's Answer listed a number of affirmative defenses, one of which asserted that Detz's "claims may be barred by the Doctrine of Estoppel." On July 15, 2002, Greiner filed a Motion for Summary Judgment, arguing that Detz was judicially estopped from establishing a prima facie case of age discrimination. Specifically, according to Greiner, Detz was precluded from showing that he was "qualified" for the position from which he was discharged, because such an assertion is irreconcilably inconsistent with his earlier statements to the SSA that he was unable to work, offered in support of his claim for SSDI benefits.

In opposing the Motion for Summary Judgment, Detz attempted to reconcile the two positions. According to Detz, he became "disabled," for SSDI purposes, by virtue of his discharge by Greiner. Before that, he was *not* "disabled," as he had a job in the Tool Room and could perform that job. After that, he *was* "disabled," because he was no longer allowed to continue performing *that* job, and he would not be able to find another job similarly tailored to his physical limitations. In other words, there was only one job in the economy that he was capable of performing — the job in the Tool Room — and the loss of that job rendered him "disabled" for SSDI purposes. He urged that he did, however, remain qualified for that one job for the purposes of the ADEA and the PHRA.

The District Court, in an Opinion and Order issued on August 16, 2002, granted summary judgment in favor of Greiner on both of Detz's claims. *Detz v. Greiner Indus.,*

*Inc.*, 224 F. Supp. 2d 905, 919 (E.D. Pa. 2002). Applying the doctrine of judicial estoppel, as we structured it in *Montrose Medical Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 777 (3d Cir. 2001), the District Court found that all three prongs of the analysis were satisfied — i.e., that the two positions were irreconcilably inconsistent, that Detz had acted in bad faith, and that judicial estoppel was an appropriate remedy. *Detz*, 224 F. Supp. 2d at 915, 918. In its discussion of the first prong, the Court applied the rule from *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), and found that while Detz might have survived summary judgment if he had offered a sufficient explanation of the apparent inconsistency between his two positions, he failed to adequately reconcile the positions. *Detz*, 224 F. Supp. 2d at 917. The Court also found that Detz had taken the conflicting positions in bad faith, and that judicial estoppel was an appropriate remedy in this case. *Id.* at 918. Thus, the Court held that Detz was judicially estopped from claiming that he remained qualified for his previous work at Greiner, and, therefore, he failed to establish a prima facie case of age discrimination. *Id.* at 919.

After the District Court entered summary judgment against him, Detz filed this timely appeal.

II.

The District Court had federal question jurisdiction over Detz's claim under the ADEA, 29 U.S.C. §§ 621-634, and supplemental jurisdiction over his claim under the PHRA, 43 Pa. Cons. Stat. §§ 951-963. *See* 28 U.S.C. §§ 1331, 1367(a). We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

We exercise plenary review over the District Court's grant of summary judgment. *Klein v. Stahl GMBH & Co. Maschinefabrik*, 185 F.3d 98, 108 (3d Cir. 1999). Summary judgment is proper where no genuine issue of material fact exists, and where, viewing the facts in the light most favorable to the party against whom summary judgment was entered, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986). This is so where "the plaintiff fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial." *Cleveland*, 526 U.S. at 805-06 (quoting *Celotex*, 477 U.S. at 322).

## III.

The case before us involves the application of judicial estoppel in the context of a motion for summary judgment. The District Court was correct to note that we have applied a multi-factor analysis to determine whether a party is judicially estopped from making certain assertions that are contrary to assertions he has made in the past. *See, e.g., Dam Things From Den. v. Russ Berrie & Co.*, 290 F.3d 548, 559 (3d Cir. 2002) (listing three considerations in a judicial estoppel analysis); *Montrose*, 243 F.3d at 777 (same); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997) (listing two main considerations in a judicial estoppel analysis); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355 (3d Cir. 1996) (same). That test is concerned with whether the party's positions are inconsistent, whether he has acted in bad faith, and whether judicial estoppel is an appropriate remedy that is tailored to address the harm caused to the integrity of the court. *Detz*, 224 F. Supp. 2d at 911. While this analysis is still appropriate in many types of cases, the Supreme Court has articulated the standard somewhat differently in considering its application to a set of facts resembling the ones we face here. *See Cleveland*, 526 U.S. at 807; *see also Motley v. N.J. State Police*, 196 F.3d 160, 164-66 (3d Cir. 1999) (recognizing that *Cleveland* provides the standard to be used when applying judicial estoppel in the context of a motion for summary judgment where the initial assertions were accepted by a court or agency).

In *Cleveland*, the Supreme Court explained the method that courts should use in deciding whether a party, in the face of her own contrary assertions made in a prior proceeding, can make a preliminary showing sufficient to survive summary judgment in a subsequent case. There, the Court was considering a case involving a plaintiff who was suing her employer for wrongful termination under the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111-12117. *Cleveland*, 526 U.S. at 798. She had previously obtained SSDI benefits, claiming that she was "totally disabled" and unable to work. *Id.* at 799. In pleading her prima facie case under the ADA, she asserted that she was a "qualified individual" — in other words, "that she could 'perform the essential functions' of her job, at least with 'reasonable accommodation.'" *Id.* (quoting the ADA, 42 U.S.C. § 12111(8)).

In deciding whether the plaintiff's previous claim of total disability precluded her from subsequently claiming to be a "qualified individual" under the ADA, the Court applied judicial estoppel principles in terms that are familiar at the summary judgment stage. The Court was convinced that "pursuit, and receipt, of SSDI benefits *does not automatically estop* the recipient from pursuing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA." *Id.* at 797-98 (emphasis added). The Court instructed, however, that when a defendant claims a bar based on previous inconsistent assertions, a plaintiff "cannot simply ignore" her previous statements to the SSA. Instead, in order to establish her prima facie case, "she must explain why that SSDI contention is consistent with" her subsequent assertion in connection with her ADA claim. *Id.* at 798. Thus, the Court essentially told us how to approach a claim of judicial estoppel in the summary judgment context.

Upon deciding that the SSDI and ADA claims did "not inherently conflict to the point where courts should apply a special negative presumption," *id.* at 802, the Court went on to explain how the facts of each particular case should be examined in order to determine whether a genuine conflict exists between the plaintiff's contrary positions. *Id.* at 805. The Court first laid out the framework for basic summary judgment analysis, and then articulated the following standard:

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be

> sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Id.* at 807. In other words, a plaintiff "could not simply ignore the apparent contradiction," or "create a genuine issue of material fact . . . simply by contradicting . . . her own previous sworn statement." *Id.* at 806. Instead, a plaintiff in this position is required to offer "a sufficient explanation," as described above. *Id.*

The Court also drew a distinction between conflicting legal positions and contradictory factual assertions. In concluding that a claim under the ADA is not inherently inconsistent with a claim of disability for SSDI purposes, the Court noted that "[a]n SSA representation of total disability differs from a purely factual statement in that it often implies a context-related legal conclusion, namely, 'I am disabled for purposes of the Social Security Act.' " *Id.* at 802. The Court, therefore, limited the import of its decision to cases involving such "context-related legal conclusions," and permitted courts to proceed with the usual judicial estoppel analysis when evaluating conflicting statements that are purely factual. *Id.*

After examining the explanation offered by the plaintiff in *Cleveland*, the Court concluded that she had adequately reconciled her two positions. *Id.* She had done so by first pointing out the differences between the analyses conducted under the SSA and the ADA — the ADA considers whether a person might be able to perform her job "with reasonable accommodation," while that possibility is ignored when determining disability for SSDI purposes. *Id.* Additionally, she had indicated that her statements on her SSDI application were true when she originally made them. *Id.* Thus, the case was remanded so that she might survive summary judgment and proceed to trial "to present . . . [her] explanations, in sworn form where appropriate." *Id.*

While *Cleveland* only specifically addressed a conflict between SSDI and ADA claims, the analysis is not limited

in its application to cases involving those particular statutory and administrative schemes. Like an assertion that one is a "qualified individual" for ADA purposes, a declaration that one is a "qualified individual" under the ADEA is a "context-related legal conclusion." Therefore, a prima facie showing under the ADEA that conflicts with earlier statements made to the SSA is subject to the same analysis, as the reasoning of the Court in *Cleveland* also applies in the context of the ADEA. In fact, the District Court here properly observed that "scenarios may exist in which it is possible for a plaintiff's ADEA claim to be consistent with his or her earlier application for Social Security benefits." *Detz*, 224 F. Supp. 2d at 916. For example, a person who files for and is granted SSDI benefits several months after his discharge would not be precluded from advancing a successful ADEA claim against his employer where his disability did not prevent him from working at the time of his discharge, but where it subsequently worsened to a point where he is no longer able to perform that work. It is true that these scenarios might be less common with ADEA claims than they would be with claims under the ADA, because the ADEA does not include any additional considerations for identifying "qualified individuals" that might be analogized to the "reasonable accommodation" language of the ADA. *Id.* at 915. This does not, however, render *Cleveland* any less applicable to cases involving SSDI claims followed by attempts to establish the elements of a prima facie showing under the ADEA.

Our sister courts of appeals that have addressed this issue in the wake of *Cleveland* have uniformly recognized that their prior judicial estoppel analyses are to be replaced with the methodology articulated by the Supreme Court. *See Holtzclaw v. DSC Communications Corp.*, 255 F.3d 254, 257-59 (5th Cir. 2001) (applying *Cleveland* rather than typical judicial estoppel analysis in reviewing a ruling on a motion for summary judgment where the plaintiff's original position was accepted by a court or agency); *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 375 (4th Cir. 2000) (same); *Lloyd v. Hardin County, Iowa*, 207 F.3d 1080, 1083 & n.3 (8th Cir. 2000) (same); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 333-34 (2d Cir. 2000) (same);

*Feldman v. Am. Mem'l Life Ins. Co.*, 196 F.3d 783, 789-90 (7th Cir. 1999) (same); *cf. Lee v. City of Salem, Ind.*, 259 F.3d 667, 672-75 (7th Cir. 2001) (applying the *Cleveland* analysis in the context of a motion for judgment as a matter of law). We have similarly applied *Cleveland* — rather than our traditional three-step "judicial estoppel" approach — as the guiding force in the context of a summary judgment motion where, as here, the claimant clearly made a contradictory assertion after benefitting from a previous sworn assertion, the court or agency thus having accepted the previous assertion.[2] *See Motley*, 196 F.3d at 164-66.

So, we must determine whether a plaintiff's assertions are genuinely in conflict, and then evaluate that plaintiff's attempt to explain away the inconsistency. The Court of Appeals for the Seventh Circuit has aptly explained what is required of a plaintiff under the *Cleveland* analysis this way:

> *Cleveland*'s analysis suggests that an ADA plaintiff may not, simply by disavowing a prior claim of total disability, perform an about-face and assert that he is a "qualified individual" who is capable of working. Rather, . . . the plaintiff must proceed from the premise that his previous assertion of an inability to work was true, or that he in good faith believed it to be true, and he must demonstrate that the assertion was nonetheless consistent with his ability to perform the essential functions of his job.

---

2. We note that in *Montrose* we drew a distinction and refused to foreclose the plaintiffs from proceeding based solely upon their later taking an inconsistent position when their previous position *had not been accepted* by the court. The plaintiffs in *Montrose*, a hospital and its retirement plan, advanced certain claims that were contrary to positions they had taken as defendants in a previous suit. 243 F.3d at 778-79. Those initial assertions, however, were never adopted by the court, as the case settled before the court took any action. *Id.* at 778. There, we concluded that in such a case something more than clear inconsistency, as per *Cleveland*, should be examined, and we proceeded to address whether there was bad faith such that there was an assault on the dignity of the court. *Id.* at 781-82. As we note, here the situation resembles *Cleveland* and *Motley*, rather than *Montrose*, so inquiry into bad faith is not necessary.

. . . .

> . . . Explanations of the sort *Cleveland* requires are, in short, contextual — they resolve the seeming discrepancy between a claim of disability and a later claim of entitlement to work not by contradicting what the plaintiff told the Social Security Administration, but by demonstrating that those representations, understood in light of the unique focus and requirements of the SSA, leave room for the possibility that the plaintiff is able to meet the essential demands of the job to which he claims a right under the ADA.

*Lee*, 259 F.3d at 674-75. And we were guided by a similar understanding of *Cleveland* when we recently scrutinized an ADA plaintiff's attempt to reconcile two apparently inconsistent positions:

> [A]n ADA plaintiff must . . . provide some additional rationale to explain [his] apparent about-face concerning the extent of the injuries. . . . The additional justification presented by the plaintiff could, in theory, go into detail regarding the facts of his . . . case, demonstrating how the differing statutory contexts makes their statements made under one scheme reconcilable with their claims under the other.

*Motley*, 196 F.3d at 165. Again, although the analysis only directly refers to claims under the ADA, the reasoning and conclusion apply with equal force to ADEA plaintiffs.

## IV.

Guided by *Cleveland* and *Motley*, the first question we must ask is whether the positions taken by Detz in his SSDI Application and his ADEA claim genuinely conflict. We answer this question on a case-by-case basis, by examining the unique facts presented by Detz's claim. *See Motley*, 196 F.3d at 164. After considering the facts before us in the instant case, we conclude that the two positions taken by Detz are truly inconsistent with one another.

In order to be "disabled" for SSDI purposes, an applicant must be incapable of performing his "past relevant work," and he must be found unable to perform any other job

existing in significant numbers in the nation's economy. *See* 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. §§ 404.1520(e)-(f), 404.1560(b)-(c) (2002). On the other hand, in order to establish a prima facie case under the ADEA, a plaintiff must show, among other things, that he was "qualified" for the position he held prior to his termination. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc). To be "qualified" a plaintiff must have been "performing his job at a level that met his employer's legitimate expectations" at the time of his discharge. *Eible v. Houston*, 1998 WL 303692, at *5 n.4 (E.D. Pa. Apr. 21, 1998) (citing *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1314-15 (4th Cir. 1993)). Considering these basic requirements, it becomes clear that a person who makes assertions in support of both claims would often appear to be making facially incompatible assertions, as the second seems to be an "about face" from, or "disavowal" of, the first.

In the Application he presented to the SSA in 1998, Detz indicated that it was his disability — the injury he had sustained to his hand and arm — that prevented him from working as of November 27, 1996. He made the blanket statement that he was unable to work. Although he had been performing his "light duty" job in the Tool Room since his injury, nowhere on the SSDI paperwork did he note that he remained physically able to continue doing that job, or that it was his discharge that rendered him "disabled." Instead, he unambiguously indicated that his disability prevented him from working at all. Even so, Detz's Application was initially denied by the SSA on a finding that his "condition [did] not keep [him] from working." The SSA actually stated in a letter to Detz: "[I]t is concluded that your restrictions do not prevent you from performing [your past work as a tool room attendant]."

But Detz did not end his attempt to obtain SSDI benefits there. He repeated his original statements regarding his disability and his inability to work twice more, as he appealed the initial denial of his benefits. Ultimately, the SSA was persuaded by his claims, which he supported with medical reports and his own sworn statements, and he was successful in his pursuit of SSDI benefits. These benefits

were awarded retroactively, as the SSA found that he became disabled on November 27, 1996, the date of his termination by Greiner. The SSA's final opinion on the matter, after its reconsideration, makes clear the fact that Detz subsequently convinced the agency, using statements of doctors to fortify his initial assertions, that as of November 27, 1996, his condition was severe enough to prevent him from performing *any* work.

Now Detz asserts that it was not his physical limitations, but rather the fact that Greiner laid him off, that rendered him "unable to work" as of November 27, 1996. He contends that he was, in fact, capable of continuing to perform his light duties in the Tool Room and, therefore, should be deemed "qualified" for that position for purposes of his claim under the ADEA. Although he failed to attribute his inability to work to his discharge on the SSDI Application, Detz would have us believe that the position he takes now is actually consistent with his prior assertions. We cannot agree.

In short, Detz informed the SSA in a sworn statement that his disability prevented him from working — in other words, that he was physically *incapable* of performing his job. Now he seeks to advance a position before this Court that rests on the assertion that he was discharged from a position that he was physically *capable* of performing. This second position "crashes face first against" his prior claim. *Feldman*, 196 F.3d at 791. Thus, we are compelled to find that his two assertions are "patently inconsistent," *Motley*, 196 F.3d at 167, and we will proceed to the second question raised under the *Cleveland* analysis — whether Detz has adequately reconciled the two positions.

We have examined the explanation offered by Detz as he attempted to harmonize his ADEA claim with his contrary statements to the SSA, and we are unable to find that it can pass muster after *Cleveland*. We are convinced that the District Court interpreted Detz's explanation correctly when it characterized that explanation as follows: "[Detz's] argument, wherein he claims that he became disabled on the very day of his termination, appears to be that he became disabled (for Social Security purposes) by virtue of his termination — that is, because, given his physical

condition, he would be unable to find another job." *Detz*, 224 F. Supp. 2d at 917.

The fatal flaw in this attempt by Detz to explain some consistency in his positions is that it ignores the statements he made repeatedly to the SSA regarding his disability. In fact, his explanation is no more than a further contradiction of his initial assertion, and it does nothing to reconcile his previous two assertions — one that he was unable to work, and the other that he could perform the job from which he was terminated. Detz indicated repeatedly on various forms submitted to the SSA that he was unable to work — and specifically that he was unable to perform his previous job — *due to his disability*. Indeed, in order to obtain SSDI benefits he had to make this assertion; otherwise, his claim would fail at Step Four of the SSA's analysis, as he would be capable of performing his "past relevant work." *See* 20 C.F.R. §§ 404.1520(e), 404.1560(b) (2002). He did not inform the SSA that he would be physically capable of continuing to perform his job in the Tool Room but for his discharge by Greiner, as he asserts now in the context of his ADEA claim. Thus, his explanation would not allow a reasonable juror to find in the first instance that Detz had a good faith belief in his entitlement to SSDI benefits, and then still conclude that he was qualified for his position at Greiner, as *Cleveland* requires.

Furthermore, a careful reading of the SSA's decision granting Detz SSDI benefits reveals that Detz succeeded in convincing the SSA that his physical limitations actually prevented him from continuing in his previous job, not just that he was impeded in his efforts to find work elsewhere. The SSA explored at length Detz's impairment and the manner in which it limited his ability to function. Upon considering Detz's sworn statement and the opinions of various doctors who had examined Detz, the SSA concluded that Detz either had "no past relevant work" or was unable to "perform any of the past relevant work given [his] residual functional capacity." The decision does not mention Detz's discharge as a factor considered by the SSA, and instead rests explicitly on the medical reports and Detz's own accounts regarding his physical limitations.

Accordingly, Detz's explanation does nothing to reconcile his current position with the statements he made to the SSA or the decision it rendered in his favor.

Had Detz's SSA Application indicated that, while he could still perform work in the Tool Room, his disability prevented him from obtaining most other jobs, we might view his later claim to be reconciled with his earlier assertions. But Detz indicated nothing of the sort when he described how his disability affected his work.[3] Instead, Detz appears to have manipulated the facts, and perhaps the system, to obtain SSDI benefits. He succeeded in convincing the agency to award benefits based on his first assertion, and his inability to adequately reconcile the patently inconsistent positions dooms his ability to pursue his ADEA claim. Like the assertions he makes in support of his ADEA claim, Detz's explanation constitutes an attempt to "create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his . . . own previous sworn statement" to the SSA. *Cleveland*, 526 U.S. at 806. Thus, the District Court properly rejected his explanation as inadequate and granted summary judgment in favor of Greiner.

## V.

In light of the foregoing discussion, we conclude that the District Court was correct in determining that Detz's explanation for the contrary positions taken in his applications for SSDI and ADEA relief was inadequate. The positions Detz advanced in his ADEA claim are patently inconsistent with the statements he made to the SSA, and his explanation does not meet the standard articulated in *Cleveland*. The District Court, therefore, did not err in granting Greiner's motion for summary judgment.

---

3. In fact, after reading his SSDI and ADEA applications carefully, we notice that Detz appears to have characterized his "past relevant work" rather differently in advancing the two claims. For SSDI purposes, he emphasized his duties as a millwright — the tougher of the two to perform — while he focused exclusively on his "light" responsibilities in the Tool Room — for which it was easier to be "qualified" — in his ADEA paperwork.

Accordingly, we will AFFIRM the Order of the District Court with respect to both of Detz's claims.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*