Haven McCLAREN, Plaintiff,

v.

**MORRISON MANAGEMENT SPECIALISTS, INC.,**
Defendant.

No. EP–01–CV–479–PRM.

United States District Court,
W.D. Texas,
El Paso Division.

April 26, 2004.

Dick Alcala, El Paso, TX, pro se.

John A. Wenke, Attorney at Law, El Paso, TX, for Plaintiff.

Harrel L. Davis, III, Krafsur Gorden Mott, P.C., El Paso, TX, Howard T. Boyd, III, Jones, Walker, et al, Shelley M. Sullivan, Cornelius R. Heusel, Charlotte S. Marquez, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP, New Orleans, LA, for Defendant.

## *MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW*

MARTINEZ, District Judge.

On this day, the Court considered Defendant Morrison Management Specialist's "Motion for Judgment as Matter of Law or, Alternatively, for New Trial or Remittitur" and Plaintiff Haven McClaren's "Response to Defendant's Motion for Judgment as a Matter of Law, New Trial, or Remittitur" which was filed in the above-captioned cause on January 29, 2004 and February 9, 2004, respectively. On March 30, 2004, the Court held a hearing on Defendant Morrison Management Specialist's "Motion for Judgment as Matter of Law or, Alternatively, for New Trial or Remittitur" and Plaintiff Haven McClaren's "Response to Defendant's Motion for Judgment as a Matter of Law, New Trial, or Remittitur". After careful consideration, the Court is of the opinion that Defendant's Motion for Judgment as a Matter of Law should be granted for the reasons discussed below.

## I. FACTS

### A. Plaintiff's Experience and Performance

Plaintiff Haven McClaren ("Plaintiff"), a sixty-seven year old gentleman who was born on April 5, 1937, and has worked in the food service industry for most of his career.[1] He started his career in the 1950's as a dishwasher and worked his way up to a cook for the Old Western International Hotels.[2] Over his forty-year career, Plaintiff also worked in the food service industry for private companies and hospitals, including Host International, the University of Oregon Medical School, Loma Hospital, and the Southwestern Hospital of Eastern Oklahoma.[3]

On April 11, 1988, Tenet Health System Medical, Inc. ("Tenet") hired Plaintiff to manage its food services unit at Sierra Medical Center ("Sierra") in El Paso, Texas. As a manager of the food services unit, Plaintiff was responsible for adminis-

1. TR 1–152:2.

2. TR 1–153:14–22.

3. TR 1–53:10–14.

tering the food services budget, inspecting the quality of the food, addressing personnel issues, and running all other aspects of the unit.[4] In recognition of his performance as a manager, Tenet promoted Plaintiff to the position of Director of Food and Nutrition at Sierra in 1992. As Director of Food and Nutrition, Plaintiff performed the following functions: (1) he supervised and instructed employees of the food services unit; (2) he designed and implemented the food menu; and (3) he managed the financial aspects of the food services unit.[5]

In 1996, while working at Sierra, Plaintiff slipped and fell on some loose tiles, hitting his body against a steel door and resulting in a serious injury to his back. Plaintiff underwent two surgeries for his back injury, then filed a worker's compensation claim against Tenet. Thereafter, Tenet and Plaintiff amicably entered into a settlement agreement in which Tenet agreed to bear the expense for Plaintiff's medical treatment and pain medication. Plaintiff continued to be treated by doctors for his back injury well into 2000. Despite treatment, Plaintiff continued to physically suffer because of his back injury.[6] During this time, Plaintiff's doctor filed regular reports with the Texas Workers' Compensation Commission.

### B. Defendant Morrison Assumes Responsibility of the Food Services Units at Tenet's Hospitals

For business reasons, Tenet decided to outsource the food services units for its El Paso hospitals. In February 2000, Tenet entered into an agreement with Defendant Morrison Management Specialists ("Defendant") to assume responsibility for food services at Providence Memorial Hospital ("Providence"), Sierra, and Rio Vista Rehabilitation Hospital ("Rio Vista").[7] Pursuant to the terms of the agreement, Defendant was required to retain all of Tenet's hospital employees for at least ninety days.

Shortly after assuming responsibility of the food services units, Defendant conducted an assessment of the organizational structure of the food services units in order to determine the appropriate staffing levels and "more effectively manage the system".[8] Defendant subsequently concluded that a Director of Food and Nutrition . was not needed at each individual Tenet facility. Accordingly, Defendant decided to implement a plan of reorganization that would eliminate the Director of Food and Nutrition positions at two of Tenet's facilities, Sierra and Rio Vista, by June 12, 2000. Once the reorganization plan was implemented, Defendant would employ a single Director of Food and Nutrition, based at Providence, and two Assistant Directors/Unit Managers, one located at Sierra and the other at Rio Vista. On May 10, 2000, Defendant mailed Plaintiff a letter apprising him of its intention to implement the new reorganization plan which would eliminate his current position

---

4. TR 1–154:3–8.

5. Defendant's Trial Exhibit # 26

6. The physical difficulties that Plaintiff experienced due to his back injury included: numbness in his legs after sitting for a period of time; inability to stand for long periods of time; and difficulty sleeping at night. TR 1–181:17–25, TR 1–182:1–10.

7. Defendant is incorporated under the laws of the State of Georgia and its principal place of business is in Georgia. Defendant's Notice of Removal. Defendant provides management services for food industry operations in the healthcare industry on an independent contractor basis. Defendant's Motion for Summary Judgment.

8. Defendant's Trial Exhibit # 12 (Defendant's Letter to Plaintiff Regarding Reorganization p. 1, Bates no. D166).

on June 12, 2000.[9] The letter also invited Plaintiff to apply for any of the new positions since Defendant intended to fill the new positions with internal candidates.

In response to the letter, Plaintiff applied for the Assistant Director/Unit Manager position at Sierra. At the time he applied for the position, Plaintiff was certified as an international food service executive, a nutritionist, and a general manager.[10] In addition, while working for Tenet, Plaintiff had been awarded Chef of the Year for the State of Texas, and recognized with the Outstanding Employee Award for Tenet Corporation. On May 31, 2000, Defendant interviewed Plaintiff for the position and explained that it would let him know if he was selected by June 12, 2000. A few days after his interview, but prior to June 12, 2000, Yolanda Lopez ("Lopez"), an employee of Morrison, and unbeknownst to Morrison management, tipped off Plaintiff that he had not been selected for the position. She also told Plaintiff that Defendant had extended an offer for the position of Assistant Director/Unit Manager to Martin Fernando King ("King"), a forty-seven year old employee who worked under the supervision and direction of Plaintiff as Assistant Director of Food and Nutrition at Sierra. Shortly thereafter, King directly told McClaren that he had been offered the position.

After receiving the information from Lopez and King (but prior to formal notification from Defendant), Plaintiff visited with his physician, P. Allen Wehrle ("Dr. Wehrle"), to discuss his continuing back pain resulting from his 1996 work-related injury. During a visit to Dr. Wehrle on June 6, 2000, Dr. Wehrle explained that Plaintiff could treat his back pain in one of two ways: (1) a second round of steroid injections; or (2) back surgery.[11] Given that the first round of steroid injections had failed to cure his back pain, Plaintiff requested that his physician refer him to a surgeon.[12] On June 7, 2000, the day following this visit, Plaintiff filed a written request for leave under the Family Medical Leave Act ("FMLA"). In his written request, Plaintiff explained that he needed to leave his employment due to a serious health condition that rendered him unable to perform the essential functions of his position.[13] On June 8, 2000, Plaintiff packed his personal belongings from his office and left a series of voice mail messages for Lopez and his supervisor, John Heath, informing them of his decision to take sick leave.[14] On June 16, 2000, Defendant mailed Plaintiff a termination letter explaining that it had not selected him for the position of Assistant Director/Unit Manager at Sierra. It also notified Plaintiff that his last day of employment with Defendant was June 8, 2000 and that he would be paid through June 23, 2000.

9. Id.

10. TR 1–152:16–20.

11. TR 1–184:18–24.

12. Based on Dr. Wehrle's medical notes, Plaintiff complained to Dr. Wehrle that he was suffering with "intractable" back pain on June 6, 2000. Defendant's Trial Exhibit # 26. Also, Dr. Wehrle's medical notes from as early as November 9, 1999 reveal that Plaintiff complained to Dr. Wehrle that he was suffering with "significant persistence of back pain." Id.

13. Defendant's Trial Exhibit # 16 (Plaintiff's Family Medical Leave Request Form p. 1, Bates no. D14).

14. Plaintiff was not eligible for FMLA benefits given that his inability to work stemmed from his 1996 work-related injury, which was covered by a worker's compensation settlement with Tenet. TR 1–98:8–11.

Between June 8, 2000 and November 2000, Plaintiff remained unemployed. Despite the fact that he was unemployed, Plaintiff's physical health deteriorated. On August 3, 2000, Plaintiff had his initial consultation with Dr. Gregory R. Misenhimer ("Dr.Misenhimer"), a surgeon who specializes in orthopaedic surgery and spinal disorders. At this initial consultation, Plaintiff complained about suffering from continued pain and discomfort in his back as well as weakness in his lower extremities. The initial consultation report indicates that

> ... Mr. McClaren has diagramed a numbness stabbing pain in the lumbar, lumbosacral and sacriolic area. He has diagramed numbness in the anterior aspect of the right and left lower extremity. He rates his pain at 9 on a scale of 10 and states that 80% of the pain was in his back and 20% in the lower extremities. The patient states that his pain is exacerbated by any form of exercise as well as prolonged sitting, standing, walking, bending forward, bending backward and lying down.[15]

Following the initial consultation, Dr. Misenhimer advised Plaintiff that he should undergo back surgery. *Id.*

Prior to conducting Plaintiff's back surgery, Dr. Misenhimer prepared a Pre–Operative History and Physical Report. In his report, Dr. Misenhimer indicated that Plaintiff's chief complaint was "pain to the back and lower extremities." In addition, the report contained information about Plaintiff's medical condition from the date of the initial consultation to the date of surgery. Specifically, the report re-

vealed that Plaintiff represented to Dr. Misenhimer that from the time of his initial consultation to the date of surgery his condition became worse. The report explained that "Mr. McClaren states the pain is becoming worse and it remains constant. He has limitation of his work, exercise, sports and other recreational activities as well as interruption of his normal sleeping patterns." [16] On November 7, 2000, Dr. Misenhimer operated on Plaintiff's back. Following surgery, Dr. Misenhimer continued to monitor and treat Plaintiff for his back condition. Dr. Misenhimer also filed Texas Workers' Compensation Work Status Reports with the Texas Workers' Compensation Commission after each visit with Plaintiff. In each of the Texas Workers' Compensation Work Status Reports, Dr. Misenhimer indicated that Plaintiff's medical condition from his worker's compensation injury restricted him from all work activities.

## C. Plaintiff's Social Security Applications and Representations to the Social Security Administration

On June 14, 2000, less than one week following Plaintiff's departure from his job-site and prior to his initial visit with Dr. Misenhimer, Plaintiff filed for Social Security benefits. In the application Plaintiff applied for all benefits for which he was eligible "under Title II (Federal Old–Age, Survivors, and Disability Insurance) and Part A of Title XVII (Health Insurance of the Aged and Disabled) of the Social Security Act." [17] After the Social Security Administration ("SSA") granted

**15.** Defendant's Trial Exhibit # 20 (Dr. Misenhimer's Initial Consultation Report p. 1., Bates no. 84).

**16.** Defendant's Trial Exhibit # 20 (Dr. Misenhimer's Pre-operative History and Physical Report p. 1, Bates no. 73).

**17.** Defendant's Trial Exhibit # 26 (Plaintiff's Application for Retirement Insurance Benefits p. 1, Bates nó. 15).

Plaintiff's Application, Plaintiff started to receive social security benefits in November 2000 and said benefits continued until April 2001 or April 2002.[18] Plaintiff thereafter filed a second application, dated February 12, 2001, with the SSA entitled "Application for Disability Benefits," in which he attested that he was disabled and *that he had been unable to work due to a disabling condition since June 6, 2000.*[19]

The Court does however find that Plaintiff's social security reports filed in May 2001, one month after Plaintiff asserts he stopped receiving benefits, are relevant to the issue of his physical and mental condition. In his "Work History Report" dated May 1, 2001, Plaintiff indicated that he was not physically or mentally capable of performing the functions of Director of Food and Nutrition at Sierra. Specifically, Plaintiff represented, "not only am I not

able to physically perform my job functions but due to all types of medication I take I'm not able to perform the mental requirements of my previous position."[20]

In the second untitled report, filed with the SSA on May 1, 2001, Plaintiff indicated to the SSA that he was suffering from the following symptoms: lower back pain, chest pain, fatigue, weakness, obesity, high blood pressure, neuropathy in both legs, dizziness, diabetes and high cholesterol.[21] Plaintiff asserted in his written statement that these symptoms prevented him from the following activities: "work, take care of my yard, car, shop-eat the way I want to, sex, hike, go fishing, movies, travel, play golf, bowl, jog."[22] Moreover, Plaintiff indicated that his symptoms substantially limited his ability to sit, stand, walk, lift, use hands, bend, reach, travel or drive.[23]

18. The Court notes that there is an inconsistency in Plaintiff's trial testimony with regard to the length of time during which he received social security disability benefits. During cross-examination Plaintiff testified that he received benefits from November 2000 until his sixty-fifth birthday (April 5, 2002). However, during redirect examination, he testified that he received disability benefits from November 2000 until April 2001. Interestingly, even though Plaintiff claims be stopped receiving benefits in April 2001, the record shows that Plaintiff filed two additional disability reports with the SSA in May 2001.

19. Defendant's Trial Exhibit # 26 (Plaintiff's Application for SSDI p. 3, Bates no. 62) (emphasis supplied). Plaintiff's Application for SSDI also contained the following acknowledgment directly above his signature:

> I know that anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment under the Social Security Act commits a crime punishable under federal law by fine, imprisonment or both. I affirm that all information I have given in connection with this claim is true.

Defendant's Trial Exhibit # 26 (Plaintiff's Application for SSDI p. 3, Bates no. 62). This second application which specifically asserts

that the date of disability was prior to the Plaintiff's non-selection is the 'basis upon which Defendant relies in asserting that Plaintiff was not "qualified" to perform the job for which he had applied.

20. Defendant's Trial Exhibit # 26 (Plaintiff's SSA Work History Report p. 8, Bates no. 72). This report also contained the following acknowledgment in capital, bold-faced letters directly above Plaintiff's signature:

> **ANYONE MAKING A FALSE STATEMENT OR REPRESENTATION OF A MATERIAL FACT FOR USE IN DETERMINING A RIGHT TO PAYMENT UNDER THE SOCIAL SECURITY ACT COMMITS A CRIME PUNISHABLE UNDER FEDERAL LAW.**

Defendant's Trial Exhibit # 26 (Plaintiff's SSA Work History Report p. 8, Bates no. 72)(emphasis in original).

21. Defendant's Trial Exhibit # 26 (Plaintiff's Untitled Report p. 1, Bates no. 73).

22. *Id.*

23. *Id.* Plaintiff's Work History Report and Untitled Disability Report reveal that Plaintiff was not able to perform many of the essential physical and mental functions of the Assistant

## II. PROCEDURAL HISTORY

Plaintiff filed a written charge of discrimination with both the Texas Human Rights Commission and the Equal Employment Opportunity Commission ("EEOC") on September 14, 2000 and September 18, 2000, respectively. In each charge of discrimination, Plaintiff alleged that Defendant discriminated against him in violation of the Age Discrimination in Employment Act of 1967 ("ADEA") and the Americans with Disabilities Act ("ADA") when it terminated his position and decided not to select him for the Assistant Director/Unit Manager position at Sierra. After receiving his right to sue notice from the EEOC, Plaintiff filed a petition against Defendant on November 7, 2001 in the 210th District Court of El Paso County. In his petition, however, Plaintiff alleged only a claim of age discrimination under the ADEA against Defendant. Specifically, the petition alleged that Plaintiff's "age was a motivating factor and consideration in Defendant's decision to terminate Plaintiff, therefore directly violating Section 21.051 of the Texas Labor Code."[24] Defendant thereafter filed a notice of removal on the basis of diversity jurisdiction on December 26, 2001. On February 20, 2003, Defendant filed a Motion for Summary Judgment. After a careful review of the evidence, the Court concluded that there was a genuine issue of material fact as to whether Plaintiff was not selected for the position because of his age. Consequently, the Court denied Defendant's Motion for Summary Judgment.[25] Following a two day trial, the jury rendered a verdict in favor of the Plaintiff in the amount of Ten Million, Five Hundred Thousand and No/100 (10,500,000.00) Dollars. On January 15, 2004, the Court entered a final judgment awarding Plaintiff Three Hun-

Director/Unit Manager position as outlined in Defendant's job description. The job description for the Assistant Direct/Unit Manager position specifically requires that the individual selected for the position be able to perform the following physical and mental functions:

Able to lift objects weighing less than 20 pounds or less occasionally. The highest point of any lift—the waist the lowest point of any lift—the floor.

Able to carry objects weighing 49 pounds or less occasionally.

Able to push/pull objects using moderate effort occasionally, Maximum effort rarely.

Able to perform motor skills such as reaching out/up, continuously. Frequently bending, twisting, turning, squatting, climbing stairs, grasping, and finger manipulation. Occasionally, feeling perception.

Able to perform tasks which require arm-hand coordination on a coordination occasionally.

Able to perform upper and lower body coordination skills continuously.

Able to sit in place 2 hours consecutively, up to 2 hours per day. Must be able to stand in place 1 hour consecutively, up to 1 hour per day. Must be able to remain on feet up to 8 hours consecutively.

Must be able to attend task/function for 60 minutes at a time or more frequently.

Able to concentrate on fine detail with constant interruptions on a frequent basis.

Able to understand and relate to specific ideas, generally one at a time on a continuous basis. Able to understand and relate to concepts behind specific ideas frequently. Able to remember tasks/assignments given at the beginning of a period of time extending several days frequently. Must be able to remember multiple tasks/assignments given to self and others over long periods of time occasionally.

Defendant's Trial Exhibit # 22.

24. Plaintiff's Original Petition p. 3.

25. For reasons unknown to the Court, Defendant's Motion for Summary Judgment failed to expressly raise the argument that the doctrine of judicial estoppel precluded Plaintiff from establishing a prima facie case under the Texas Commission of Human Rights Act. Accordingly, the Court was not afforded the opportunity to address the issue presented in its post-trial motions by way of a pretrial dispositive motion.

dred Thousand and No/100 ($300,000.00) Dollars in compensatory damages. Defendants then timely filed the motions before the Court pursuant to Federal Rule of Civil Procedure 50.

In its Brief in Support of Judgment as a Matter of Law, Defendant raises two main arguments. Defendant first asserts that Plaintiff is judicially estopped from establishing a prima facie case of age discrimination under the Texas Commission of Human Rights Act ("TCHRA") because Plaintiff previously filed for SSDI benefits and made detailed statements to the SSA about the nature and extent of his disability. Defendant then asserts that even if the Court finds that Plaintiff was qualified under TCHRA, Plaintiff failed to meet his burden of showing that Defendant's reasons for not hiring him were pretextual.

In his response, Plaintiff asserts that his application for and receipt of SSDI does not judicially estop him from establishing that he was qualified under TCHRA for the Assistant Director/Unit Manager position because, if selected, he would have been able to work despite his disability. Plaintiff also contends that the Court is precluded under Federal Rule of Civil Procedure 50 from considering the merits of Defendant's second argument because Defendant failed to raise the argument at trial.

## III. LEGAL STANDARDS

### A. Judgment as a Matter of Law

Federal Rule of Civil Procedure 50(a)(1) provides that a district court should grant a motion for judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). In *Reeves v. Sanderson Plumbing Prods.*, the Supreme Court explained that the standard for granting summary judgment "mirrors" the standard for judgment as a matter of law, such that the "inquiry under each is the same." 530 U.S. 133, 150–151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Specifically, the Supreme Court stated:

> in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'

*Reeves*, 530 U.S. at 140, 120 S.Ct. 2097. (citations omitted).

### B. Texas Commission of Human Rights Act

 TCHRA prohibits, *inter alia*, employment discrimination on the basis of age. In order to establish a prima facie case of age discrimination under TCHRA, a plaintiff must establish the following elements: (1) that he was within the protected age group; (2) that he was adversely affected; (3) that he was replaced by a younger person; and (4) that he was qualified for the job. "To be 'qualified' a plaintiff must have been 'performing his job at

a level that met his employer's legitimate expectations' at the time of his discharge." *Detz v. Greiner Indus. Inc,* 346 F.3d 109, 119 (3d Cir.2003); *See Hill v. Lockheed Martin Logistics Management Inc.,* 354 F.3d 277, 285 (4th Cir.2004); *Murphy v. Univ. of Cincinnati,* 72 Fed.Appx. 288, 293 (6th Cir.2003).

██ The Texas Supreme Court has explained that the Texas legislature, in enacting TCHRA, "intended to correlate state law with federal law in employment discrimination cases." *Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735 (Tex. 2003) (per curiam). Thus, Texas state courts consistently construe TCHRA with federal law interpreting Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 et seq., and the ADEA, 29 U.S.C. § 621 et seq. *Caballero v. Cent. Power & Light Co.,* 858 S.W.2d 359, 361 (Tex.1993) ("Another stated purpose [of TCHRA] is to coordinate and conform with federal law under Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act." (internal citations omitted)). In fact, courts are entitled to examine federal case law for guidance and it may be cited as authority. *Specialty Retailers, Inc. v. De-Moranville,* 933 S.W.2d 490, 492 (Tex. 1996); *Guerrero v. Refugio County,* 946 S.W.2d 558, 566 (Tex.App.—Corpus Christi 1997, no writ); *Benavides v. Moore,* 848 S.W.2d 190, 193 (Tex.App.—Corpus Christi 1992, writ denied). Given the absence of Texas case law addressing whether a prior application for and receipt of SSDI benefits judicially estops a party from establishing a prima facie case of age discrimination, the Court finds it necessary to consider how other how federal courts have reconciled the issue in the context of its federal counterparts, namely Title VII and the ADEA.

## C. Judicial Estoppel Doctrine

██ In *New Hampshire v. Maine,* the Supreme Court for the first time elaborated on the doctrine of judicial estoppel. 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).[26] The Supreme Court explained that the doctrine of judicial estoppel is intended to protect the integrity of the judicial process by preventing a party who prevails on one ground in one judicial proceeding from repudiating that ground in a subsequent judicial proceeding. *Id.* at 749, 121 S.Ct. 1808. In order to help district courts determine whether the doctrine of judicial estoppel applies to a given situation, the Supreme Court has provided courts with three factors to consider: (1) whether a party's later position is "clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position", so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 752, 121 S.Ct. 1808 (internal quotes and citations omitted).

### 1. *Cleveland v. Policy Management Systems Corp, et al.*

In *Cleveland v. Policy Management Systems Corp.,* the Supreme Court ex-

---

**26.** Prior to *New Hampshire v. Maine,* the Supreme Court had only referred to the doctrine in two prior cases but had not engaged in a substantive analysis of the doctrine. *New Hampshire,* 532 U.S. at 749, 121 S.Ct. 1808. Accordingly, the Supreme Court in *New*

*Hampshire* cited the decisions of several federal courts of appeals, including the Fifth Circuit, when developing its three factor test for determining whether the doctrine of judicial estoppel should apply. *Id.* at 750–51, 121 S.Ct. 1808.

plained how courts should apply the doctrine of judicial estoppel in the context of an employment discrimination case where a plaintiff has filed for and received SSDI benefits. *Cleveland v. Policy Mgt. Sys. Corp., et al.*, 526 U.S. 795, 805, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). In *Cleveland*, the Supreme Court specifically established a two-part test to determine whether an ADA plaintiff who has filed for and received SSDI benefits is judicially estopped from establishing a prima facie case of discrimination under the ADA. *Cleveland*, 526 U.S. at 805, 119 S.Ct. 1597. The plaintiff in *Cleveland* filed a disability claim with the SSA after suffering from a disabling stroke and losing her job. After filing a SSDI application indicating that she was "disabled" and "unable to work", she then filed a suit alleging that her former employer violated the ADA when it terminated her employment without reasonably accommodating her disability. The district court granted the employer's motion for summary judgment finding that the plaintiff had conceded that she was totally disabled by filing for and receiving social security benefits. Due to her representations to the SSA that she was totally disabled, the district court concluded that she was estopped from proving an essential element of her ADA claim, namely that she was a qualified individual with a disability who could perform the essential requirement (or functions) of her job with reasonable accommodation. On appeal, the Fifth Circuit affirmed the lower Court's decision stating that "the application for or receipt of social security disability benefits creates a rebuttable presumption that the claimant or recipient of such benefits is judicially estopped from asserting that she is a "qualified individual with a disability." *Cleveland*, 526 U.S. at 800, 119 S.Ct. 1597.

Given that there was disagreement among the circuits as to the legal effect an application for, or receipt of, disability benefits should have upon an ADA suit, the Supreme Court granted certiorari. *Cleveland*, 526 U.S. at 801, 119 S.Ct. at 1601. After carefully analyzing the purpose and the language of the SSA and the ADA, the Supreme Court concluded that the application for and receipt of SSDI benefits does not *automatically* bar recovery or create a rebuttable presumption against the recipient's success under the ADA. *Id.* at 798, 119 S.Ct. 1597. The Supreme Court further explained that given the differences in the definition of "disability" under the Social Security Act[27] and the definition of "qualified" under the ADA,[28] it is possible that an individual may "disabled" for purposes of the SSDI and still be able to establish that he or she is a "qualified" individual with a disability under the ADA. Specifically, the Court stated that "despite the appearance of conflict that arises from the language of the two statutes the two claims do not inherently conflict to the point where courts should apply a negative

---

**27.** The Social Security Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any ... physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover the Social Security Act states that the impairment must be "of such severity that [a claimant] *is not only* unable to do [his or her] previous work but cannot, considering [his or her] age, edu-

cation, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 423(d)(2)(A).

**28.** The ADA defines a "qualified individual with a disability" as a disabled person "who ... can perform the essential functions" of her job, including those who can do so only "with ... reasonable accommodation." 42 U.S.C. § 12111(8).

presumption like the one applied by the Court of Appeals here." *Id.* at 803, 119 S.Ct. 1597.

■ The Supreme Court, however, acknowledged that a plaintiff is judicially estopped when his or her earlier SSDI claim genuinely conflicts with an ADA claim. *Cleveland,* 526 U.S. at 805–806, 119 S.Ct. 1597. The Supreme Court established a framework to use when analyzing whether an ADA plaintiff who has previously filed an SSDI application can overcome a motion for summary judgment. Under the framework, a court must consider whether there is an apparent inconsistency between the plaintiff's statements made on the SSDI application and a plaintiff's claim that he is a qualified person with a disability, an essential element of a prima facie case of ADA. The Supreme Court went on to explain that "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element" of her ADA case, namely that she is a qualified person with a disability, unless the plaintiff provides specific explanation for the apparent inconsistency. *Id.* at 806, 119 S.Ct. 1597. In other words, the Court specifically explained that in order to successfully defeat a motion for summary judgment, "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of an earlier SSDI total disability claim case. Rather, [an ADA plaintiff] must proffer a sufficient explanation." *Id.* In *Cleveland,* the Supreme Court concluded that the plaintiff had adequately explained that the apparent inconsistency between her SSDI statements (that she was totally disabled for purposes of the SSA) and her ADA claim (that she was a qualified person with a disability as she could perform the essential functions of her job with reasonable accommodation). In other words, the

plaintiff was able to adequately explain that the statements made on her SSDI application were not inconsistent with her ADA claim because the SSA did not consider the effect that reasonable accommodations would have on her ability to work. Accordingly, the Supreme Court concluded that plaintiff could establish a prima facie case of discrimination under the ADA and remanded it to the district court for trial.

The Supreme Court has yet to expressly state whether the *Cleveland* analysis extends to other employment discrimination statutes. Although the Fifth Circuit has applied the *Cleveland* analysis when evaluating whether a district court properly denied a motion for a judgment as a matter of law in an ADA case where plaintiff had applied for SSDI benefits, it has not specifically addressed whether the *Cleveland* analysis should apply outside the context of an ADA claim. *See Giles v. Gen. Elect. Co.,* 245 F.3d 474 (5th Cir.2001).

### 2. Judicial Estoppel and ADEA Claims

Although the Supreme Court has not specifically addressed whether the *Cleveland* analysis applies to ADEA claims, the Court is not without guidance on this issue because courts from at least two other federal circuits have considered and applied *Cleveland* in the context of an ADEA claim. Both, the United States Court of Appeals for the Third Circuit and a district court in the Seventh Circuit have employed the *Cleveland* analysis to determine whether an ADEA plaintiff who applied and received SSDI benefits is judicially estopped from establishing a prima facie case. *Detz,* 346 F.3d 109; *Johnson v. Exxon Mobil Corp.,* No. 02–C–5003, 2004 WL 419897, 2004 U.S. Dist. LEXIS 1279 (N.D.Ill. Jan.30, 2004). Additionally, a Texas Court of Appeals recently applied the *Cleveland* analysis to determine

whether an individual who had received disability benefits was judicially estopped from establishing a prima facie case of disability and sex discrimination under TCHRA. *Johnson v. Hoechst Celanese Corp.*, 127 S.W.3d 875 (Tex.App.—Corpus Christi 2004). In light of the foregoing, the Court will apply the *Cleveland* analysis to the case at hand.

### a. *Detz v. Greiner Indus. Inc.*

In *Detz,* the plaintiff, a fifty-nine year old male, was terminated by his former employer. Shortly after being terminated from his position, the plaintiff filed an SSDI application asserting that he was "disabled" and "unable to work." *Detz,* 346 F.3d at 119–120. In his application, the plaintiff represented to the SSA that he became unable to work because of a disabling condition on the date of his termination and that he was still disabled at the time of his application. *Id.* at 112. After filing his application for SSDI benefits, the plaintiff filed suit against his former employer alleging that the employer had violated ADEA as well as the Pennsylvania Human Relations Act when it terminated him. The employer, in turn, filed a motion for summary judgment asserting that the plaintiff was judicially estopped from establishing a prima facie case of age discrimination given his prior statements to the SSA. *Id.* at 114. In his attempt to reconcile the two apparent inconsistent positions before the district court, the plaintiff asserted that "he became disabled for Social Security purposes as soon as his job with [the former employer] ended because due to his physical condition, he would thereafter be unable to secure any other position." *Detz v. Greiner Indus. Inc.,* 224 F.Supp.2d 905, 916 (E.D.Pa.2002). In other words, the plaintiff asserted that he was only qualified to perform the position from which he was terminated (a light duty job in the former employer's tool room) given his physical condition. The district court rejected the plaintiff's efforts to reconcile the two definitions, finding that the plaintiff's assertion that he would have been able to perform his old job does not adequately explain his statements to the SSA that he was unable to perform *any* work, including his old job (a light duty job in the former employer's tool room). After reviewing the plaintiff's response which attempted to reconcile the apparent inconsistency, the district court granted Defendant's motion for summary judgment. *Id.* at 919.

On appeal, the Third Circuit affirmed the district court's decision, finding that the plaintiff was judicially estopped under *Cleveland. Detz,* 346 F.3d at 121. In its decision, the Third Circuit interpreted *Cleveland* to require that it engage in a two-step analysis in order to determine whether the plaintiff was judicially estopped from establishing his ADEA claim. *Id.* at 118. First, the Third Circuit explained that it needed to consider whether the plaintiff's statements to the SSA conflicted with the plaintiff's assertion that he was qualified for the position under the ADEA. *Id.* On several occasions the plaintiff "indicated repeatedly on various forms submitted to the SSA that he was unable to work- and specifically that he was unable to perform his previous job -*due to his disability.*" *Id.* at 120. At no point did he represent to the SSA that he was still qualified to perform light duty work. Yet at trial, Plaintiff sought to advance the position that he was discharged from a position that he was physically capable of performing. The Third Circuit concluded that the two positions were "patently inconsistent" and proceeded to the second part of the analysis. *Id.*

Under the second part of the *Cleveland* analysis, the plaintiff attempted to harmonize his ADEA claim with his SSDI

application by claiming that "he became disabled (for Social Security purposes) by virtue of his termination—that is, because, given his physical condition, he would be unable to find another job." *Id.* The Third Circuit rejected plaintiff's explanation stating that it "is no more than a further contradiction of his initial assertion and it does nothing to reconcile his previous two assertions—one that he was able to work, and the other that he could perform the job which he was terminated." *Id.* Accordingly, the Third Circuit concluded that the plaintiff's explanation failed to meet the standard articulated in *Cleveland*, and therefore plaintiff was judicially estopped from establishing that he was qualified for the position under ADEA.

### b. *Johnson v. Exxon Mobile Corp.*

In *Johnson*, a district court in the Northern District of Illinois applied the two part *Cleveland* analysis when evaluating whether a plaintiff was judicially estopped from establishing an ADEA claim. *Johnson*, 2004 WL 419897, *5, 2004 WL U.S. Dist. LEXIS 1279 *17. The court in *Johnson* noted that it is more difficult for an ADEA plaintiff to reconcile an apparent inconsistency than it is for an ADA plaintiff. *Id.*, 2004 WL 419897, *6, 2004 U.S. Dist. LEXIS 1279, *19. This is due to the fact that unlike the ADA, the ADEA definition of qualified does not provide any consideration of a potential "reasonable accommodation and instead simply requires that the individual must be qualified to perform the job according to his employer's legitimate expectations." *Id.*

In *Johnson*, the plaintiff, a fifty-four year old male, filed a suit against his former employer after being terminated. *Johnson*, 2004 WL 419897, **1-2, 2004 WL U.S. Dist. LEXIS 1279 *4. In his complaint, the plaintiff alleged that he was discriminated against in violation of several federal employment anti-discrimination

statutes, including the ADEA. *Id.*, 2004 WL 419897, *2, 2004 U.S. Dist. LEXIS 1279, *7. Almost a year after being discharged, he filed an SSDI application stating that he became unable to work because of his epilepsy on the same date that he was terminated by his former employer. *Id.*, 2004 WL 419897, **1-2, 2004 WL U.S. Dist. LEXIS 1279 *4. A few months after the court denied the former employer's motion for summary judgment, the SSA approved the plaintiff's SSDI application. *Id.* The former employer then filed a motion urging the court to reconsider its motion for summary judgment in light of the fact that the plaintiff's application had been approved. On the morning of trial, the court entertained the former employer's motion to reconsider its motion for summary judgment and requested that the plaintiff attempt to explain the apparent inconsistency between his sworn statements to the SSA and his assertion that he was in fact qualified under ADEA. The plaintiff's counsel attempted to reconcile the apparent inconsistency by stating that he would produce evidence at trial that would establish that he was in fact able to work on the date that he was terminated, that his conditioned worsened immediately after he was terminated, that he did not personally complete the SSDI application, and that he did not file the application until one year after his termination. *Id.* at 2004 WL 419897, *3, 2004 U.S. Dist. LEXIS 1279, *11.

The district court then applied the two-step *Cleveland* analysis to determine whether the plaintiff was judicially estopped from establishing a prima facie case under ADEA. *Id.*, 2004 WL 419897, **4-5, 2004 U.S. Dist. LEXIS 1279 *14. The court first considered whether the statements and representations in his SSDI application were inconsistent with the statements made to the court that he

was qualified under ADEA. *Id.* After carefully considering these two definitions the court concluded that the plaintiff's positions were clearly inconsistent. *Id.* Given plaintiff's inconsistency, the court moved on to the second step of the *Cleveland* analysis which requires the plaintiff to sufficiently explain why his statements to the SSA are not genuinely inconsistent with his assertion that he was qualified for the position for purposes of ADEA. *Id.* at 2004 WL 419897, *5, 2004 U.S. Dist. LEXIS 1279, *15. The court concluded that the plaintiff's argument that he was able to perform his employment duties according to his former employer's legitimate expectations on the date that he was terminated constituted a disavowal and not an explanation. *Id.* at 2004 WL 419897, **5–6, 2004 U.S. Dist. LEXIS 1279, *16. The court went on to explain that, as a matter of law, the plaintiff cannot reconcile an apparent inconsistency by simply disavowing his earlier statement. *Id.*, 2004 WL 419897, *5, 2004 WL U.S. Dist. LEXIS 1279, *17. Instead, the court explained that "[a] plaintiff hoping to reconcile contradictory statements must base his explanation on the difference between what it means to be disabled for SSDI purposes and what it means to perform according to the employer's legitimate expectations under the ADEA." *Id.* at 2004 WL 419897, **5–6, 2004 U.S. Dist. LEXIS 1279, *16. Since the plaintiff failed to reconcile the apparent inconsistency, the court concluded that plaintiff was judicially estopped from establishing that he was qualified for purposes of ADEA and therefore granted the employer's motion summary judgment.

### c. Application to the Instant Case

 Under the first part of the *Cleveland* analysis, the Court must consider whether there is an apparent inconsistency between Plaintiff's statements to the SSA and his assertion that he was qualified for purposes of TCHRA. *Cleveland,* 526 U.S. at 805, 119 S.Ct. 1597; *Detz,* 346 F.3d at 118–119; *Johnson,* 2004 WL 419897, **4–5, 2004 U.S. Dist. LEXIS 1279 *14. Like the plaintiff in *Detz* and the plaintiff in *Johnson,* Plaintiff was an employee over the age of forty [29] who was terminated by his former employer and subsequently applied for and received SSDI benefits. *Detz,* 346 F.3d at 110; *Johnson,* 2004 WL 419897, **1–2, 2004 WL U.S. Dist. LEXIS 1279 *4. Like the plaintiff in *Detz* and the plaintiff in *Johnson,* Plaintiff filed an application with the SSA in which he represented that he was entitled to SSDI benefits because he was disabled and unable to work since June 6, 2000–two days before he was terminated from his position. Moreover, Plaintiff filed work history reports with the SSA in which he indicated that he could not perform many of the essential functions of life allowing the SSA to conclude that Plaintiff was, in fact, disabled. Similar to the application and medical reports in *Detz,* Plaintiff's application and work history report did not in any way explain to the SSA that Plaintiff would be able to perform the duties of the Assistant Director/Unit Manager position despite his disability. *Detz,* 346 F.3d at 113. Yet, in the instant suit, Plaintiff has asserted to the Court and the jury that he was qualified under TCHRA for the Assistant Director/Unit Manager position on June 8, 2000. Specifically, Plaintiff asserted that he would have been able to successfully perform all of the responsibilities and functions despite his physical condition had he been selected for the position for which he

---

**29.** In order to establish a prima facie case of age discrimination under the ADEA and TCHRA, a plaintiff must establish that he is a member of a protected class by establishing that he is over the age of forty, *Evans v. City of Houston,* 246 F.3d 344, 348 (5th Cir.2001); *Russo v. Smith Intern., Inc.,* 93 S.W.3d 428 (Tex.App.-Houston 2002).

applied. Based on the foregoing, the Court finds that there is an obvious inconsistency between Plaintiff's statements to the SSA that he was unable to work given his disability, and Plaintiff's statements to the Court and the jury that he would have been able to work if selected for the position of Assistant Director/Unit Manager. *See id.* at 118–119. To borrow the words of the Third Circuit "[t]his second position 'crashes face first against his prior claim.'" *Id.* at 120 (citing *Feldman v. Am. Mem'l Life Ins.*, 196 F.3d 783, 791 (7th Cir.1999)).

■ Given the apparent inconsistency in the statements, the Court must apply the second part of the *Cleveland* analysis. *Cleveland*, 526 U.S. at 806, 119 S.Ct. 1597; *Detz*, 346 F.3d at 121; *Johnson*, 2004 WL 419897, *5, 2004 U.S. Dist. LEXIS 1279 *15. Under the second part of the *Cleveland* analysis Plaintiff must sufficiently explain how the two claims are not genuinely inconsistent. *Id.* In order to reconcile his contradictory statements, Plaintiff must explain the difference of what it means to be disabled for purposes of SSA and what it means to be qualified under TCHRA. *Detz*, 346 F.3d at 120; *Johnson*, 2004 WL 419897, **5–6, 2004 U.S. Dist. LEXIS 1279 *16. Like the plaintiff in *Johnson*, however, Plaintiff fails to base his explanation on the difference between what it means to be disabled for SSDI purposes and what it means to perform according to the employer's legitimate expectations under the ADEA. *Johnson*, 2004 WL 419897, **5–6, 2004 U.S. Dist. LEXIS 1279 *16. Instead, Plaintiff attempts to reconcile the inconsistency by not addressing the statements made to the SSA; Plaintiff simply states that he was qualified for purposes of TCHRA because he was willing and able to work despite his disability. However, Plaintiff's statements to the SSA and his medical reports reveal that despite the fact that Plaintiff remained out of work and performed little physical activity in the time period between his termination and back surgery, Plaintiff's physical condition deteriorated to the point that he could not work or perform many of life's essential functions. Hence, the Court finds that Plaintiff's statements to the SSA about his poor physical condition and Plaintiff's statements to this Court that he was physically capable of performing the job if selected are patently inconsistent. Plaintiff's attempt to reconcile the inconsistency in his statements amounts simply to a disavowal. *Detz*, 346 F.3d at 120; *Johnson*, 2004 WL 419897, *5, 2004 U.S. Dist. LEXIS 1279 *17. Accordingly, the Court finds that Plaintiff has failed to meet his burden under *Cleveland* and therefore is not able to establish an essential element of a prima facie case under TCHRA, namely that he was qualified for the position.

## IV. CONCLUSION

After applying the *Cleveland* analysis to the instant case, the Court finds that Plaintiff has not reconciled his statements that he was disabled since June 6, 2000 for purposes of SSDI with his assertion that he is qualified for purposes of TCHRA. Therefore, Plaintiff is judicially estopped from establishing a prima facie case under TCHRA. Since Plaintiff cannot establish a prima facie case of age discrimination under TCHRA, the Court is of the opinion that Defendant's Motion for Judgment as a Matter of Law should be granted. Accordingly, it is not necessary to address the merits of Defendant's alternative arguments for a new trial or remittitur.

Accordingly, **IT IS ORDERED** that Defendant's Motion for Judgment as a Matter of Law is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for New Trial is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Remittitur is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the Court's Final Judgment which was signed and entered on January 15, 2004 is **VACATED**.

**IT IS FINALLY ORDERED** that all other pending motions, if any, are **DENIED AS MOOT**.